PARFI HOLDING AB, Gunnar Gillberg, Plenteous Corp, and Grandsen, Ltd., Plaintiffs,

v.

MIRROR IMAGE INTERNET, INC., Xcelera.com, Inc., Alexander M. Vik, Gustav Vik and Hans Magnus Faherson, Defendants.

C.A. No. 18507.

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 19, 2003.
Decided: Feb. 12, 2004.

**1246** 

Melanie K. Sharp, Young Conaway Stargatt & Taylor, LLP, Wilmington; Robert G. Eisler, Daniel P. Chiplock, and Elizabeth S. Watson, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City; M. Frederick Pritzker, James W. Soll, and Stephanie Taverna Siden, Brown Rudnik Berlack Isreals, LLP, Boston, MA, for Plaintiffs.

Jesse A. Finkelstein, and Thad J. Bracegirdle, Richards Layton & Finger, Wilmington; Peter J. MacDonald, Robin L. Alperstein, and Deborah Kovsky–Apap, Hale and Dorr, New York City, for Defendants.

## OPINION

STRINE, Vice Chancellor.

This case involves a challenge by stockholders of Mirror Image Internet, Inc. ("Mirror Image") to a series of transactions (hereafter defined as the "Challenged Transactions") that, taken together, enabled defendant Xcelera.com, Inc. ("Xcelera") – which became Mirror Image's controlling stockholder following execution of an "Underwriting Agreement" in 1999 – to secure for itself a large super-majority of the company's stock and then to sell that stock at the height of the Internet bubble.

That course of action is alleged to have been consummated through breaches of fiduciary duty by the Mirror Image board majority selected by Xcelera, which was comprised of persons who also served as Xcelera directors. According to the plaintiffs in this action, Xcelera's conduct in diluting the minority stockholders violated not only obligations owed to them under Delaware law but also duties Xcelera owed to them under the Underwriting Agreement (which was governed by Swedish law), and the promises that induced certain of the minority stockholders to sign that Agreement.

In earlier proceedings in this case, this court found that the plaintiffs in this case were attempting to prosecute claims that, by virtue of the Underwriting Agreement, were subject to mandatory arbitration. At the time of that ruling, certain of the plaintiffs had already prosecuted claims in an "Arbitration" in Sweden before a three-person arbitration panel (the "Arbitrators"). The claims in the Arbitration clearly attacked the Challenged Transactions, alleging that those Transactions, among other things, involved "unfair dilution." Therefore, this court dismissed the plaintiffs' claims. The arbitration clause required that all claims in connection with the Underwriting Agreement or its possible invalidity be arbitrated. Because the identical conduct that the plaintiffs contended in this court to be a breach of fiduciary duty was also argued by them before the Arbitrators to be a breach of the Underwriting Agreement and evidence of the invalidity of that Agreement, this

court found the necessary connection implicating the arbitration clause.

On appeal, the Supreme Court reversed and found that the arbitration clause in the Underwriting Agreement could not be read to require the arbitration of the plaintiffs' fiduciary duty claims even though the conduct underlying those claims was the very same conduct that the claimants in the Arbitration alleged to be a breach of the Underwriting Agreement, and of the promises Xcelera had made to the claimants in inducing them to enter into the Underwriting Agreement. Because the plaintiffs' fiduciary duty claims could be proved without reference to the Underwriting Agreement or any promises related to it, the Supreme Court held that the fiduciary duty claims lacked the necessary connection to implicate the arbitration clause. This ruling was justified, in large measure, by the importance of permitting stockholders to litigate fiduciary duty claims in the Delaware courts. To divest a plaintiff of that opportunity, an arbitration clause had to be absolutely clear that fiduciary duty claims were to be presented only in arbitration. In its ruling, the Supreme Court possessed the "Arbitral Award" which granted one of the plaintiffs in this action a right to damages arising out of certain of the Challenged Transactions because those Transactions had been effected without obtaining certain consents promised to that plaintiff. That plaintiff has recently sought to have the Arbitrators quantify damages arising from Xcelera's actions.

Before the court now is the defendants' motion to enjoin a resumption of the Arbitration. The premise of the defendants' motion is that the plaintiffs are seeking to have two bites at the apple by seeking damages from the Arbitrators arising out of the same transactions that the plaintiffs are attacking in this court. The defen-

dants claim that the Supreme Court's decision makes clear that this relief must be sought in this case and not in the Arbitration. Alternatively, the defendants argue that the plaintiffs have waived their right to arbitrate by representing to this court that they were not seeking the relief they now have sought from the Arbitrators.

In this opinion, I deny the defendants' motion to enjoin the resumption of the Arbitration. The Supreme Court's opinion makes clear that the arbitration clause anticipated claim-splitting and that the plaintiffs could seek damages arising from alleged breaches of Swedish law in connection with the Challenged Transactions in the Arbitration while simultaneously pursuing damages arising from alleged breaches of fiduciary duty in connection with the Challenged Transactions in this court – even though most, if not all, of the conduct underlying all those claims was identical. Given this reality, the plaintiffs' attempt to resume the Arbitration to obtain a specific damages award does not force the defendants to arbitrate non-arbitrable claims. Nor have the plaintiffs waived their right to arbitrate. Although the plaintiffs' statements to this court and the Supreme Court about their arguments before the Arbitrators have (to put it gently) been less than admirably candid, I cannot fairly conclude that they have ever waived their right to seek damages under Swedish law in the Arbitration.

I. *The Plaintiffs' Allegations In This Lawsuit*

To address the defendants' motion, it is necessary to understand the procession of the disputes among the plaintiffs, who were the minority stockholders of Mirror Image, and Xcelera and its affiliated defendants, who controlled Mirror Image. I begin with the plaintiffs' allegations in this action.

Mirror Image is a Delaware corporation that designed hardware to speed the processing of information flows through the Internet. Mirror Image was formed in 1997 as a subsidiary of Mirror Image AB ("Mirror AB"), a Swedish corporation.

Like many start-ups, Mirror Image was capital-intensive. Eventually, Mirror AB was unable to fund Mirror Image on its own, despite having invested $10 million in the company. In 1999, therefore, Mirror AB sought outside investors for Mirror Image. This was a good time to seek such investors, coming as it did near the height of the technology bubble.

Mirror AB landed two investors for Mirror Image: Xcelera and Plenteous Corp. Those entities were not in common control.

To implement Xcelera's and Plenteous's investment in Mirror Image, the Underwriting Agreement was executed contemplating the issuance of shares of Mirror Image common stock to those two investors. By the terms of that Agreement, Xcelera would become Mirror Image's controlling stockholder in exchange for a commitment by it to infuse $1.75 million into the company and purchase the bulk of the new shares. Xcelera was guaranteed the opportunity to own a majority of the company's shares.

For its part, Plenteous was expected to buy the bulk of the shares not purchased by Xcelera for $250,000. Certain individuals with large investments in Mirror AB were given the opportunity to subscribe to the offering by exercising options to be issued certain of the shares that would otherwise have gone to Xcelera and Plenteous.[1]

Xcelera and Plenteous were given the power to name four of Mirror Image's five directors. All four of the directors eventually appointed by Xcelera and Plenteous were Xcelera directors, including two brothers, Alexander and Gustav Vik, who own Xcelera through Vik Brothers International. Plenteous contends that one of the four directors was supposed to have been an affiliate of it but that Xcelera did not honor that promise. Mirror AB was granted the right to appoint one director so long as Xcelera and Plenteous held a majority of Mirror Image's stock. Mirror AB purportedly appointed Sverker Lindbo, Mirror Image's then-President and CEO, to the board.

Within a few months of the Underwriting Agreement, however, Xcelera went from owning 62.5% to 91.8% of Mirror Image's stock. This increase was achieved through two new stock subscriptions approved at hastily called stockholders' meetings.

In these subscriptions — undertaken in April 1999 and July 1999 — Xcelera subscribed to and received all of the new Mirror Image shares issued in two offerings in exchange for $7 million. In this litigation, it is alleged that the "April Subscription" and "July Subscription" were unnecessary, as Mirror Image did not need that cash. At the very least, say the plaintiffs, Mirror Image did not need the cash so quickly that the other stockholders — including Plenteous — could not have been given sufficient time and an adequate opportunity to subscribe for their proportionate allocation of the shares available for subscription, thereby main-

---

**1.** The details of how the Underwriting Agreement was implemented and how it affected the capital structure and ownership of Mirror Image are detailed in this court's earlier decision. *See Parfi Holding AB v. Mirror Image Internet, Inc. ("Parfi I"),* 794 A.2d 1211, 1216–18 (Del.Ch.2001), *rev'd,* 817 A.2d 149 (Del.2002). Additionally, for purposes of simplicity, this opinion uses the same names for the parties used in this court's earlier opinion although certain of the parties have gone by or currently operate under different names.

taining their same proportionate ownership of the company. Moreover, the plaintiffs contend that Xcelera did not pay fair market value for the new shares in the Subscriptions. In sum, the plaintiffs contend that the April and July Subscriptions were unfair dilutions of the minority stockholders of Mirror Image by Xcelera. During this period, the plaintiffs also allege that Xcelera generally trampled over Lindbo, causing him to leave his management jobs, and preventing him from acting as a director.

After the April and July Subscriptions, Mirror Image was allegedly presented with lucrative opportunities arising out of the Internet boom. Specifically, Xcelera's key man, Alexander Vik, was quietly negotiating a strategic alliance with Hewlett–Packard. Along with this exciting development, Vik allegedly knew that a leading securities analyst was going to issue a favorable report on Mirror Image's technology.

Therefore, Xcelera supposedly acted to take advantage of these prospects by causing the Mirror Image board to authorize the private placement of newly created Convertible Preferred Stock on November 30, 1999 (the "Convertible Offering"). Once again, the deal was allegedly structured so that only Xcelera could participate and, even better, so that Xcelera would not have to pay for its new shares until the pending strategic alliance with HP was consummated and publicly disclosed.

On December 21, 1999, Mirror Image announced that HP would make a $32 million investment in the company (the "HP Transaction"). Within two days of the announcement, Xcelera's stock price (which was presumably based largely on the value of its principal asset, i.e., a controlling stake in Mirror Image) soared from $67 per share to $160 per share. At

or around this time, Xcelera paid its first installment of $8 million for the Convertible Preferred Stock.

The plaintiffs allege that this was just the first stage of the fun for Xcelera. A prominent technology industry analyst trumpeted Mirror Image, which pumped Xcelera's stock up to $190 per share. The plaintiffs allege that the increase in Xcelera's share price ultimately resulting from the announcement of the HP Transaction gave Xcelera the wherewithal to pay the remainder due on the Convertible Preferred Stock.

The culmination of this bonanza came on March 22, 2000. At that time, Xcelera announced that Exodus Communications, Inc. ("Exodus") had agreed to purchase a large block of Mirror Image shares for a total value of $637.5 million, consisting of $75 million in cash and the rest in Exodus stock (the "Exodus Transaction"). Under the terms of the Exodus Transaction, only 25% of the consideration went to Mirror Image — the remaining 75% went to Xcelera in exchange for shares it owned in Mirror Image.

The plaintiffs allege that the reason that the Exodus Transaction was structured in that manner is that it allowed Xcelera to take equity it had caused Mirror Image to issue at unfair prices and only (because of timing and other conditions) to itself and turn around and sell that equity for a huge gain. Had Mirror Image been governed properly, all of the Mirror Image stockholders before the April and July Subscriptions and the Convertible Offering would have reaped the benefits of HP's and Exodus's interest in Mirror Image. Instead, Xcelera used its control to divert those benefits almost exclusively to itself.

This, according to the plaintiffs, is fiduciary misconduct of the most egregious kind. For simplicity, I refer to the various

transactions that, taken together, comprise the central focus of the plaintiffs' claims — the April and July Subscriptions, the Convertible Offering and the HP and Exodus Transactions — collectively as the "Challenged Transactions."

## II. The Arguments Advanced In The Arbitration Relating To The Challenged Transactions

In the Arbitration in Sweden, the claimants were Mirror AB and Plenteous. At all times, they were coordinating their prosecution of the arbitration with all the other plaintiffs in this action, as part of a joint effort to recover.[2]

Simultaneously with pressing fiduciary duty claims based on the Challenged Transactions in this court, the plaintiffs also sought relief in the form of monetary damages in the Arbitration against Xcelera based on those same Transactions.

In my view, it is indisputable that Mirror AB and Plenteous attempted to obtain damages in the Arbitration by arguing that the April and July Subscriptions, the Convertible Offering, and the HP and Exodus Transactions were, taken together, an unfair scheme by which Xcelera diluted the minority stockholders of Mirror Image and reaped profits for itself that belonged

proportionately to the holders of Mirror Image immediately after the consummation of the Underwriting Agreement. The Arbitral Award is replete with recitations of arguments of precisely this kind made by the claimants.[3]

In particular, the claimants argued that the parties to the Underwriting Agreement had reached certain understandings regarding how and when new investment capital would be raised for Mirror Image after consummation of the Underwriting Agreement. These supposed understandings involved, among other things, the "assumptions" — the Swedish law term that reflects those material understandings or representations which, if false, justify invalidating a contract — that: 1) Mirror Image would only raise the additional capital it needed to operate until June 1999 and that before June 1999, Mirror Image would develop a business plan in order to make it possible to raise venture capital at higher prices than were paid under the Underwriting Agreement; 2) once Xcelera became majority stockholder, it would act in good faith regarding the economic interests of the minority stockholders; 3) Xcelera would use its best efforts to honor its future obligations to the claimants; and 4) Xcelera did not intend to, and would not, use its position as majority stockholder to

---

**2.** Indeed, the plaintiffs — including Plenteous — formed a corporation, Parfi Holding AB, as a construct by which to jointly pursue relief against Xcelera and its affiliates. The plaintiffs' economic arrangements are complicated. According to the defendants, plaintiffs Plenteous and Gunnar Gillberg (a significant Mirror AB stockholder) now control more than 84% of any recovery achieved in this case, whereas plaintiffs Parfi (the Mirror AB-driven litigation company that is a plaintiff) and Grandsen, Ltd. (also a significant Mirror AB stockholder) now allegedly have a zero percent interest in any recovery. Out of this complexity emerges one evident fact: The plaintiffs in this action and the claimants in the Arbitration have collaborated jointly to obtain relief from Xcelera for harm they claim

to have suffered from the Challenged Transactions.

**3.** See, e.g., Arb. Award at 5 (detailing alleged threats of dilution and arguing that the April Subscription was designed to prevent the minority from participating); id. at 6 (the purported opportunity for minority stockholders to invest in the July Subscription was a "sham"); id. (the Exodus and HP transactions lacked "legitimate business reasons" and "further dilute[d] the minority shareholders"); id. (in Exodus Transaction, Xcelera "structured the investment so as to retain for itself most of the investment" to the detriment of Mirror Image).

dilute unfairly the ownership percentage held by the claimants. Moreover, the claimants argued that even if the Underwriting Agreement was not declared invalid for the failure of these assumptions, the Underwriting Agreement was itself breached because, among other things:

> [T]he ownership balance stated in the Underwriting Agreement represented the balance under which the parties would co-operate to work against a more permanent venture capital financing of [Mirror Image]. Each party was entitled to keep his percentage, as regards ownership of [Mirror Image], until a more permanent venture capital financing was raised from outside. By disturbing this ownership balance without consent from the other parties, [Xcelera] committed a breach of contract that has rendered [Xcelera] liable to pay damages to the Claimants.[4]

In the Arbitration, Plenteous was able to advance some arguments that Mirror AB could not. One was ultimately very important. To wit, Plenteous argued that Xcelera agreed that it would not initiate corporate action between itself and Mirror Image without obtaining the consent of one of two individuals identified by Plenteous, Atle Lygren or Tryggwe Karlsten (the "Promised Consent"), and that Plenteous assumed that Xcelera would adhere to this agreement when Plenteous entered into the Underwriting Agreement. This separate assumption was premised on communications by Xcelera to Plenteous, to which Mirror Image was not a party.

As might be expected, Xcelera, the respondent in the Arbitration, took issue with all of the allegations made by the claimants. That it understood itself to be facing claims based on the Challenged Transactions is clear from the Arbitral Award, which recites in detail Xcelera's denial of the allegations that those Transactions were unfair and that Xcelera acted in bad faith.[5] For example, the respondent felt obliged to argue that Xcelera had "acted in good faith as regards the economic interests of [Mirror Image] and the minority shareholders."[6] As to the April and July Subscriptions and the Convertible Offering, the respondent argued that those transactions were not implemented "for purposes of diluting Mirror AB and Plenteous or for purposes of enforcing measures to such a diluting effect."[7] Moreover, the respondent argued that those Transactions did not cause any economic loss to the claimants because, among other things, (a) Mirror Image needed a capital infusion and the dilution would have resulted to the minority regardless if it was Xcelera or a third party buying the new shares and (b) Xcelera paid "fair value" for the shares it received in the April and July Subscriptions.[8] The respondent also argued that the Exodus and HP Transactions had "legitimate business purposes," countering an argument by the claimants to the contrary.[9]

Given these arguments, it is somewhat odd — but nonetheless, a fact — that the claimants informed the Arbitrators that they were not arguing that Xcelera and its representatives on the Mirror Image board had breached their fiduciary duties under Delaware law in connection with the Challenged Transactions. That is, the claimants had

---

4. *Id.* at 11.

5. *Id.* at 12–18.

6. *Id.* at 18.

7. *Id.*

8. *Id.* at 21.

9. *Id.* at 13.

not asked the Tribunal to consider the legal effects of the corporate actions in [Mirror Image] after the Underwriting Agreement (including the disputed share issues in April and July 1999 . . .) except insofar as such actions may have relevance for the validity of the Underwriting Agreement or give rise to damages for breach of the Underwriting Agreement and undertakings ancillary thereto.[10]

In contrast to this statement, however, the claimants also argued that the Underwriting Agreement was invalid precisely because of the failure of an assumption that Xcelera would not unfairly dilute the minority stockholders. The Arbitrators' words rejecting that argument warrant recitation:

> *According to the Claimants it was yet another decisive factor underlying the decision by the Claimants to execute the Underwriting Agreement that the Respondent did not have the intention to, and would not indeed, use its future position as majority shareholder for purposes of diluting the percentage of shares owned by the Claimants,* who would become minority shareholders of [Mirror Image], and for purposes of enforcing measures to such a diluting effect.
>
> *The Claimants have explained that by dilution they mean only "unfair" dilution,* not any such dilution as will inevitably occur by an issue of shares in which the minority shareholders do not participate. In the understanding of the Tribunal the distinction between fair and unfair dilution can absent express agreement be drawn only with reference to applicable company law. It can be said

that any agreement resulting in some lasting relation between the parties thereto is premised on the assumption that the other party or parties will in the future behave within the limits of the law. Such assumption does not, however, trigger legal remedies different from those which follow from the application of the relevant law. In this case it is accordingly for the Courts of the State of Delaware to determine whether there was "unfair" dilution and what the legal consequences may be. *The Tribunal cannot find that any particular assumptions regarding dilution relevant to this arbitration have been proved.*[11]

Soon after issuing these words, the Arbitrators went on to expressly hold that there was insufficient evidence to find that Xcelera had a scheme to dilute the minority shareholders "in mind" when it entered into the Underwriting Agreement.[12]

## III. *The Arbitrators' Decision*

In the end, the Arbitrators found that the Underwriting Agreement was invalid as between Plenteous and Xcelera, but that the other claimant, Mirror AB, had not proven its case. The ground for finding the Underwriting Agreement invalid as to Plenteous was singular. The Arbitrators found that Plenteous's assumption that Xcelera would not undertake corporate action between itself and Mirror Image without the Promised Consent had failed. This right to the Promised Consent, the Arbitrators found, was critical to Plenteous's decision to sign the Underwriting Agreement because Plenteous wanted to protect itself against the possibility of suffering "unfair[ ] dilut[ion]"[13] at the hands of Xcelera. The Arbitrators found

---

10. *Id.* at 25.

11. *Id.* at 28–29 (emphasis added).

12. *Id.* at 30.

13. *Id.* at 28.

that Xcelera had caused remediable damage to Plenteous by effecting the April and July Subscriptions without the Promised Consent. By contrast, the Arbitrators found that the HP and Exodus Transactions did not involve "corporate action" between Xcelera and Mirror Image and that Xcelera owed no obligation to obtain the Promised Consent as to those Transactions.

Furthermore, the Arbitrators held that Xcelera's promise to Plenteous that the Promised Consent would be obtained for certain corporate actions between Xcelera and Mirror Image did not involve Mirror AB. Therefore, Xcelera's breach of that promise in effecting the April and July Subscriptions only justified relief as to Plenteous.

Likewise, as to all other claims, the Arbitrators found for Xcelera. This included rejecting the claimants' arguments that Xcelera did not honor a promise made to Plenteous to put Plenteous's affiliate, Mr. Lygren, on the Mirror Image board and that Xcelera thwarted Mirror AB's right to name one director by denying its putative nominee, Sverker Lindbo, of the "opportunity to fulfil his assignment as director." [14]

Finally, it is also worth noting that the Arbitrators rejected the argument that the parties to the Underwriting Agreement had relied upon the "assumption" that Mirror Image would eschew seeking additional financing until it could complete a business plan and "raise additional venture capital at more favourable valuations." [15] Rather, the Arbitrators found that the "relationship between the new group of shareholders was on a long term basis and as with shareholders in any company their views

on the strategy and financing of [Mirror Image] could well change rapidly." [16]

Having concluded that Mirror AB had failed to make out any claim, the Arbitrators ordered its claims dismissed. Plenteous, of course, had a happier fate, having prevailed on one major claim.

The Arbitrators declared the Underwriting Agreement invalid as to Plenteous and concluded that Xcelera was obligated to pay Plenteous damages resulting from the failure to obtain the Promised Consent for the April and July Subscriptions. In that respect, they found that Karlsten (one of the persons from whom the Promised Consent could have been obtained) had been convinced by Alexander Vik that Mirror Image needed capital in those months but that Karlsten had insisted that any new share issuance be structured to "allow as many shareholders as possible to subscribe and that all shareholders should be equally treated." [17] But the Arbitrators found that "the terms [of the April and July Subscriptions] were not at all of the kind thus envisaged by Mr. Karlsten." [18] The Arbitrators did not fix the damages due to Plenteous but left that for another day.

## IV. *The Defendants' Prior Motion To Dismiss And This Court's Decision*

The Arbitration took place while this case was pending. Even more importantly, it took place while the defendants in this case were pressing a motion to dismiss based in part on the argument that the claims pled in this case involving the Challenged Transactions were subject to the mandatory arbitration provision in the Underwriting Agreement. That provision

14. *Id.* at 32.

15. *Id.* at 26.

16. *Id.*

17. *Id.* at 28.

18. *Id.*

states that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof shall be settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce." [19] During the briefing on the motion to dismiss, the Arbitral Award was issued.

In a detailed opinion, this court examined the arbitrability of the plaintiffs' fiduciary duty claims attacking the fairness of the Challenged Transactions. Specifically, the court quoted extensively from the Arbitral Award, showing — as it has done again — that the claimants in the Arbitration attacked the fairness of the Challenged Transactions and based their claims for the invalidity and breach of the Underwriting Agreement on those Transactions.[20]

The court went on to note the fine line that the claimants in the Arbitration tried to walk:

> At the arbitration, Parfi presented evidence regarding all of those Transactions and their effect on the minority stockholders of Mirror Image. But because it had also filed suit here, Parfi simultaneously told the arbitration panel that it was not seeking to arbitrate the question of whether the April and July Subscriptions, the Convertible Preferred Stock Offering, and the Exodus Transaction involved breaches of fiduciary duty under Delaware law by Xcelera, except insofar as Xcelera's alleged improprieties in effecting those Transactions bore on its breach of contract and fraudulent inducement claims.
>
> Parfi's advocacy strategy appears to have persuaded the arbitration panel to

avoid making any findings regarding whether the Challenged Transactions involved breaches of fiduciary duty under Delaware law. Thus, the panel stated:

> The Claimants have ... not based their case in the present arbitration on or presented evidence regarding Delaware law. Also, they have not invoked the duties and obligations of Xcelera as majority shareholder towards the minority in [Mirror Image]. They have also not asked the Tribunal to consider the legal effects of the corporate actions in [Mirror Image] after the Underwriting Agreement (including the disputed share issues in April and July 1999 to which the Tribunal will revert in the following) except insofar as such actions may have relevance for the validity of the Underwriting Agreement or give rise to damages for breach of the Underwriting Agreement and undertakings ancillary thereto.[21]

The court then noted that the plaintiffs in this case believed that this technique was permitted:

> In keeping with this statement, Parfi argues that the claims it has asserted in this case regarding the Challenged Transactions do not fall within the scope of the arbitration clause. Two primary contentions buttress Parfi's position: (1) that the claims pending in this action are not dependent on the validity or invalidity of the Underwriting Agreement, but arise solely out of the duties Xcelera and the Director Defendants owed as a matter of the law of fiduciary duty; and (2) that Parfi did not voluntarily submit the

**19.** Underwriting Agreement § 20.2.

**20.** *Parfi I,* 794 A.2d at 1222–24 & nn.26–29.

**21.** *Id.* at 1225 (quoting Arb. Award at 25) (footnotes & emphasis omitted).

claims pending in this action to arbitration.[22]

This court found that argument unconvincing and read the arbitration provision of the Underwriting Agreement as expressing a broader intent. Specifically, the court stated:

> The problem with Parfi's position is that it ignores the plain language of the arbitration clause. That language does not solely require the arbitration of claims that the Underwriting Agreement was breached or was invalid. The first phrase of the clause, which requires arbitration of claims "arising out of" the Agreement, would seem to cover direct claims for breach of the Agreement or fraud in the inducement. But the drafters of the clause were not content to cover only those claims arising directly under the contract. Instead, they went on to draft additional language requiring the arbitration of claims "connected" not only to the Underwriting Agreement, but more broadly to the "breach" or the "invalidity" of that Agreement. The language is, as the defendants argue, quite expansive in scope.
>
> The clause is therefore most logically read as requiring Parfi to arbitrate any claims connected to any alleged breach of the Underwriting Agreement. By its own words in the arbitration proceeding, Parfi has again and again set forth its view that the Challenged Transactions constituted a breach of the Underwriting Agreement, and were evidence of Xcelera's fraudulent intent at the time the Underwriting Agreement was consummated. The word "connection" means, among other things, a "[r]eference or relation to something else." As used in the arbitration clause, the term is most sensibly read as requiring the arbitration of any claims connected (or

related) to conduct asserted to be a breach of the Underwriting Agreement or conduct that forms the basis for a claim that the Agreement is invalid. That is, it should be understood as an expression of the parties' desire to have disputes connected to claims that the Underwriting Agreement was invalid or breached arbitrated simultaneously with those claims.

> Here, Parfi itself has "connected" its claims in this case to an alleged breach of or invalidity of the Underwriting Agreement. The Challenged Transactions are alleged to have caused the contractual damages that Parfi assertedly suffered and that Parfi sought to recover in the arbitration. Xcelera's conduct in effecting those Transactions was argued to be a breach of the Agreement's implied term that the minority stockholders would not be diluted.

> Despite facing pending arguments in this court that its claims here were arbitrable, Parfi itself was unable to "disconnect" its contract claims from the claims pled in this case. Its arguments to the arbitrators are replete with references to the Challenged Transactions, which were at the heart of its claims for contractual damages.

> Recognizing this vulnerability, Parfi encourages me to read the "in connection with" language in the arbitration clause as only applying to non-contract claims that have legal elements that overlap breach of contract or fraudulent inducement claims, regardless if the non-contract claims address the identical factual conduct as the contract or inducement claims. That is, Parfi argues that its claims in this case are not arbitrable, because they can be proven without the need to prove a breach of the

22. *Id.* at 1225–26.

Underwriting Agreement or the invalidity of that Agreement. As noted, the difficulty with this argument is that if the parties to the Underwriting Agreement sought to draft a clause requiring only the arbitration of those claims that have as an element a breach of the Agreement, they could have done so. Instead, they chose the much broader term "in connection with" and used it in a manner that is much more plausibly read as requiring a party to arbitrate any claims connected to conduct that is contended to be a breach of the Agreement.

The commercial good sense of the defendants' reading is more apparent as well. Under their reading, the Agreement requires the resolution of claims related to a common set of underlying facts in a single forum, thus resulting in the efficient use of the parties' litigative resources.[23]

Although this left the plaintiffs in a bind because they had failed to submit all their claims regarding the Challenged Transactions to the Arbitrators, this court noted that the plaintiffs

float[ed] in a brine of their own making, having consciously chosen the risky strategy of dividing factually connected claims.

Once [the plaintiffs] decided that the Challenged Transactions were a breach of the Underwriting Agreement and evidence of the invalidity of that Agreement, [they] implicated one of the plain purposes of the arbitration clause: to require that all other claims connected

to arbitrable breach of contract and fraud in the inducement claims be arbitrated as well.[24]

Having concluded that the plaintiffs were pressing claims in this court that had to be arbitrated, the court dismissed their complaint.

## V. The Supreme Court Finds That The Plaintiffs May Seek Damages Based On The Challenged Transactions In This Case And Arbitration

The plaintiffs took a timely and ultimately successful appeal. In contrast to this court, the Supreme Court held that the "in connection with" language of the arbitration clause was implicated only if the plaintiffs' claims "based on fiduciary duties touch on the obligations created in the Underwriting Agreement."[25] Because any stockholder of Mirror Image could have pled the fiduciary duty claims attacking the Challenged Transactions, those claims — the Supreme Court found — implicated a "set of rights and obligations that are independent of any contract."[26] The "in connection with" language in the arbitration provision, the Court held, is implicated by fiduciary duty claims only if those claims would not have been "assertable had there been no Underwriting Agreement."[27]

Interestingly, in supporting its holding, the Supreme Court cited to the Arbitrators' rejection of the claimants' argument that one of the assumptions the parties relied upon in entering the Underwriting Agreement was that Xcelera would not

**23.** *Id.* at 1226–27 (footnotes & emphasis omitted).

**24.** *Id.* at 1228.

**25.** *Parfi Holding AB v. Mirror Image Internet, Inc. ("Parfi II")*, 817 A.2d 149, 157 (Del. 2002).

**26.** *Id.*

**27.** *Id.*

dilute the minority stockholders unfairly.[28] That is, the very fact that the claimants alleged and the Arbitrators rejected the argument that the parties to the Underwriting Agreement had incorporated into that Agreement protections against conduct such as Xcelera undertook in effecting the April and July Subscriptions and Convertible Offering buttressed the Supreme Court's conclusion that the plaintiffs were free to attack the Challenged Transactions in this court on fiduciary duty grounds without violating the arbitration provision. Put simply, the Supreme Court clearly understood that it was interpreting the arbitration clause as leaving the plaintiffs with the chance to take two bites at the Challenged Transactions apple. With one bite, the plaintiffs could sweepingly claim in Arbitration that the Underwriting Agreement and its underlying assumptions provided them with contractual protection against "unfair" dilution. With another bite, the plaintiffs could argue in this court that irrespective of the Underwriting Agreement or its pos-

sible invalidity, the Challenged Transactions were consummated in violation of the defendants' fiduciary duties.

Implicit in the Supreme Court's holding, fairly read, is a policy decision that arbitration clauses should not be read to require the arbitration of fiduciary duty claims unless they explicitly say so.[29] Because the Supreme Court understood that it was allowing the plaintiffs to challenge the fairness of the identical conduct in two forums simultaneously and the large inefficiencies such claim-splitting imposes, its decision emphasizes the high value Delaware places on affording remedies to stockholders for breaches of fiduciary duty.[30]

## VI. *The Proceedings After Remand*

After the Supreme Court reversed, this case proceeded with discovery, which is still on-going. On September 12, 2003, Plenteous took the action which inspired the current motion practice. That day it wrote to the Arbitrators and asked them

**28.** *Id.* at 158 (citing Arb. Award at 29). In this regard, it is worth noting a part of the Award which expressly states: "Each of the Claimants [in this arbitration] has claimed that the Underwriting Agreement be declared invalid and/or that the Respondent be declared to be liable in damages based on either circumstances invoked in support of the alleged invalidity or circumstances closely connected thereto." Arb. Award at 24. It is fair to go further and recognize that the plaintiffs' claim before this court that certain of the Challenged Transactions caused "unfair dilution" in violation of Delaware law and the claimants' allegation before the Arbitrators that "unfair dilution" was prohibited by the Underwriting Agreement or its underlying assumptions are not only connected, they are indistinguishable in that they both depended on finding the dilutions were unfair – i.e., a breach of fiduciary duty.

**29.** *See Parfi II,* 817 A.2d at 160 ("Absent a clear expression of an intent to arbitrate breach of fiduciary duty claims, Parfi has the

right to have the merits of those claims adjudicated by the Court of Chancery.").

**30.** The Supreme Court did indicate that it believed that it was "absurd" that the parties to the Underwriting Agreement would have been the only ones forced to arbitrate fiduciary duty claims. *Id.* at 159. Candidly, the absurdity of this is not at all apparent to me. Mirror Image was closely held and the parties to the Underwriting Agreement represented most of the stockholders of Mirror Image and were closely affiliated with the remainder. Moreover, it is not at all unusual for parties to a contract to bind each other and not strangers to the contract. In this regard, for example, the Arbitrators found that Plenteous achieved, by agreement, a contractual approval right (as to certain transactions) that benefited only it, and not Mirror AB or any other Mirror Image stockholder. The fact that a contract might affect the parties' remedies against each other, but not remedies available to strangers to the contract is not, to me anyway, necessarily irrational.

to resume the proceedings so that Plenteous could seek damages. In its letter, Plenteous stated:

> In the Award, the tribunal ruled that Xcelera, Inc. ("Xcelera") is liable to compensate Plenteous for the damage suffered because of the decisions on April 23, 1999, and July 10, 1999, to issue shares in Mirror Image Internet, Inc. ("Mirror Image"), made without the [Promised] [C]onsent from either Mr. Atle Lygren or Mr. Tryggwe Karlsten.
>
> As an effect of its holding in Mirror Image being diluted, from 13,5135 percent as of April 1999, following the April 23rd and July 10th 1999 resolutions, as well as the November resolution, Plenteous suffered damages equivalent to a grand total of USD 569,323,755.00.
>
> The damages are calculated by taking into account the market value of the Mirror Image stock, at the time when Xcelera sold a great number of shares to Exodus, times the relative number of shares that Plenteous would have possessed had not Xcelera diluted Plenteous'[s] ownership (the "Deprived Shares"), minus an amount corresponding to what Plenteous would have paid for the Deprived Shares.
>
> One part of the grand total, to be exact USD 56,932,376.00, relates to the number of the Deprived Shares that Plenteous would have been able and willing to sell to Exodus if the resolutions had not been made. Considering that Mr. Atle Lygren possessed a veto right, it is most likely that Plenteous would have been able to participate in the sale of shares to Exodus on a *pro rata* basis. It is therefore most likely that Plenteous would have sold at least 10% of the Diluted Shares to Exodus, at the same price that Exodus actually paid to Xcelera.
>
> The other part of the grand total, to be exact USD 512,391,380.00, relates to the remaining number of the Deprived Shares that Plenteous would have been able to sell to another third party if the resolutions had not been made. Considering the evident market value of the Deprived Shares, and the purpose of Plenteous'[s] original investment, it is most likely that Plenteous would have been both able and willing to sell the remaining 90% of the Diluted Shares to another third party. It is therefore most likely that Plenteous would have sold the remaining 90% of the Diluted Shares to another third party, at the market value that was evident at the time.
>
> Plenteous hereby claims payment of compensation for the damages mentioned above.[31]

Through this letter, Plenteous is seeking from the Arbitrators exactly the same remedy that it seeks from this Court as compensation for its fiduciary duty claims attacking the Challenged Transactions.

## VII. *The Defendants' Reaction To Plenteous's Desire To Resume The Arbitration*

This tactic did not find favor with the defendants. As they point out, this tactic is, at the very least, in tension with the arguments advanced by the plaintiffs to this court and to the Supreme Court when the plaintiffs were trying to establish that their fiduciary duty claims were not arbitrable. During the previous arguments, the plaintiffs tried to argue that the claimants in the Arbitration never attacked the fairness of the Challenged Transactions in the Arbitration. This court found then, and continues to believe, that these statements were inaccurate. The Arbitral

---

**31.** Def.'s Ex. A.

Award makes abundantly clear — as the sampling of excerpts cited in this opinion shows — that the claimants in the Arbitration claimed that the Challenged Transactions were unfair and illegitimate and that, as a result, the Underwriting Agreement was breached, if not rendered entirely invalid. The fact that the Arbitrators rejected those arguments does not mean that the arguments were not advanced.

For purposes of this opinion, it is perhaps more noteworthy that the plaintiffs at times implied that the claimants in the Arbitration were not asking the Arbitrators to quantify damages, because that would be the task of this court once it decided the fiduciary duty claims.[32] Indeed, in arguments to this court, the plaintiffs lampooned the notion that the Exodus and HP Transactions were related in any way to the Underwriting Agreement.[33] The plaintiffs even argued that the Arbitrators had already found that the HP and Exodus Transactions fell outside of Xcelera's obligation to obtain the Promised Consent from Plenteous as to certain actions.[34]

On appeal to the Supreme Court, the plaintiffs again claimed that they had never attacked the fairness of the Challenged Transactions in the Arbitration.[35] Again, this was simply not a correct statement of fact. As they did below in this court, the plaintiffs also argued in the Supreme Court that the Exodus Transaction could not plausibly be connected to the Underwriting Agreement.[36]

Because of these previous statements and the whipsawed position they find themselves in, the defendants have moved for the entry of a permanent injunction preventing Plenteous from seeking to resume the Arbitration in order to obtain damages based on the consummation of the Challenged Transactions. Having set forth the relevant procedural history at regrettable, but necessary length, I now resolve that motion.

## VIII. The Resolution Of The Defendants' Motion To Enjoin Further Arbitration

██ To obtain a permanent injunction, the defendants must succeed on the merits of their claim that Plenteous is seeking to arbitrate non-arbitrable claims, convince me that they face immediate and irreparable injury, and show that the balance of hardships tilts in their direction.[37] Here, the resolution of this motion turns primarily on the merits, It is well settled that parties cannot be required to arbitrate non-arbitrable claims and that the procession of an unwarranted arbitration poses the threat of irreparable injury to the party rightfully resisting arbitration.[38]

██ The key issue therefore is whether the defendants have proven that Plenteous is now seeking to arbitrate non-arbitrable claims. The defendants advance two arguments in this respect. The first is that Plenteous is clearly attempting to arbitrate claims premised on the Challenged Transactions and that this is inconsistent with

---

**32.** Def.'s Ex. D. at 72–73, 78–79, 87–88.

**33.** *Id.* at 76–77; Def.'s Ex. E. at 9.

**34.** Def.'s Ex. E. at 9.

**35.** *E.g.,* Def.'s Ex. G. at 34–35; Def.'s Ex. H. at 9, 16–17.

**36.** Def.'s Ex. G. at 35.

**37.** *See, e.g., Qwest Communications Int'l Inc. v. Nat'l Union Fire Ins. Co.,* 821 A.2d 323, 327–28 (Del.Ch.2002).

**38.** *See, e.g., Bd. of Educ. v. Sussex Tech Educ. Ass'n,* 1998 WL 157373, at *5 (Del.Ch. Mar. 18, 1998); *Del. Pub. Employees v. New Castle County,* 1994 WL 515291, at *4 (Del.Ch. Aug. 25, 1994).

the position that the plaintiffs previously took in this action in arguing that its attacks on the Challenged Transactions in this forum were not within the scope of the arbitration clause. The second, related, argument is that Plenteous waived its right to arbitrate any claim for damages it suffered as a result of the Challenged Transactions.[39] The supposed waiver was made by Plenteous when it (as one of the plaintiffs in this action) made arguments to this court and the Supreme Court that allegedly represented that Plenteous would not be seeking relief from the Arbitrators in the form of monetary damages for any of the Challenged Transactions, particularly the Exodus and HP transactions.

■ Although I am sympathetic to these arguments, the Supreme Court's prior decision in this case precludes my acceptance of them. As the preceding sections of this opinion demonstrate, the plaintiffs in this action were at the very least "cute" in their various arguments to this court, the Supreme Court, and the Arbitrators. They sought to have it both ways. There is absolutely no doubt that the claimants in the Arbitration — who are in all material respects identical to the plaintiffs here — sought to obtain in the Arbitration relief based on the premise that the Challenged Transactions were unfair, illegitimate, and otherwise an abuse of the duties Xcelera owed the minority stockholders of Mirror Image. In essence, the claimants argued that the parties to the Underwriting Agreement assumed (in

the binding Swedish-law sense) that Xcelera would not breach its fiduciary duties to the minority after the Agreement was implemented. This is indisputable and the plaintiffs' arguments to the contrary did not convince me when I addressed the motion to dismiss and they do not convince me now. The record is irrefutable on this score.

That said, the Arbitrators themselves policed this issue by limiting their Award to addressing claims premised on promises (whether or not explicitly contained within the Underwriting Agreement itself) made to the claimants in the contracting process leading to the signing of the Underwriting Agreement. The Arbitrators expressly eschewed any determination of whether Xcelera (or its affiliated directors on the Mirror Image board) had acted improperly as fiduciaries of the minority stockholders of Mirror Image.

On appeal, the Supreme Court was well aware of the Arbitral Award. I take it that the Supreme Court recognized that the plaintiffs had attempted to do what they said they had not — obtain relief from the Arbitrators based on the "unfair" nature of the Challenged Transactions — but that the Arbitrators had prevented them from doing so. It is also clear that the Supreme Court knew that the Arbitrators had found that Plenteous was entitled to damages on account of the April and July Subscriptions because those Transactions were consummated without the Promised Consent.[40] The Supreme Court expressly noted that the Arbitrators had "awarded Plenteous

---

**39.** It is, of course, the case that a party may waive its right to arbitration by expressly waiving that right, actively participating in litigation as to an arbitrable claim, or otherwise taking action inconsistent with the right to arbitration. *See, e.g., Ballenger v. Applied Digital Solutions, Inc.,* 2002 WL 749162, at *7–8 (Del.Ch. Apr. 24, 2002); *Wilshire Restau-*

*rant Group, Inc. v. Ramada, Inc.,* 1990 WL 195910, at *2 (Del.Ch. Dec. 5, 1990).

**40.** The Arbitral Award expressly states that Xcelera "is liable to compensate Plenteous for the damage suffered because of the two decisions on April 23, 1999, and July 10, 1999 to issue shares in [Mirror Image], made without the [Promised Consent]." Arb. Award at 33.

damages for any resulting dilution in their interest in Mirror Image."[41]

It is, of course, true that Plenteous made some ambiguous statements to this court in which it implied that it would be asking this court to pick up from where the Arbitrators left off. The defendants also point out that the plaintiffs argued to this court and the Supreme Court that it was absurd to think that their attack on the Exodus Transaction was arbitrable but that Plenteous is now seeking damages from the Arbitrators based on its exclusion from that Transaction. They also note that the Arbitrators did not award relief to Plenteous based on the Exodus and HP Transactions, finding those Transactions to not require the Promised Consent. In sum, the defendants feel buffeted by inconsistent arguments and bewildered by the demand that they defend identical conduct in different forums.

The problem that the defendants face, however, flows naturally from the more narrow reading that the Supreme Court gave to the arbitration clause. In my previous decision, I read that clause as requiring the arbitration of all claims arising out of conduct that was argued to be in breach of the Underwriting Agreement or to prove the invalidity of that Agreement.[42] This ruling was based on the evident connection between the fiduciary duty claims and the "Agreement, *or* the breach, termination, or invalidity thereof" — the only connection the arbitration clause's language seemingly required.[43] Plenteous's actions after the Supreme Court's decision can be rationally thought of as further highlighting the connection between the plaintiffs' fiduciary duty claims and the Underwriting Agreement and its invalidity. But this court's prior ruling that the arbitration clause was designed to require the arbitration of all claims based on conduct alleged to be a breach of the Underwriting Agreement or to be evidence of the invalidity of that Agreement (e.g., by showing a failure of assumption) was emphatically rejected by the Supreme Court.[44] The Supreme Court's opinion made clear that claim-splitting was contemplated by the arbitration clause.[45]

Thus, the inefficiency Plenteous now seeks to inflict on its adversaries is not wrongful, as the Supreme Court understood that such inefficiency necessarily resulted from the narrower interpretation of

41. *Parfi II*, 817 A.2d at 153.

42. *Parfi I*, 794 A.2d at 1222–28.

43. Underwriting Agreement § 20.2 (emphasis added).

44. In its opinion, the Supreme Court referred to a decision of another court that indicated that the fact that a contract had an arbitration clause requiring the arbitration of claims relating to the contract would not require a party who was assaulted by the other party to the contract to arbitrate his tort claim. *Parfi II*, 817 A.2d at 156 n. 22 (discussing *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir.1995)). This unexceptional proposition has little to do with the scenario that has resulted here, in which the identical conduct that the claimants in the Arbitration cited as evidence that Xcelera violated the Underwriting Agreement or the assumptions underlying it (a claim of contractual "invalidity" under Swedish law) is also alleged to be a breach of fiduciary duty. The connection here is far more logical than the absurd scenario in which one contracting party batters the other and then claims that the arbitration clause of the unrelated contract governs the injured party's tort claims. If need be, the common law of contracts is flexible enough to create a "physical assault" exception to arbitrability if it is feared that such an unlikely scenario will arise if arbitration clauses are read, when their plain language warrants, as incorporating a bar against splitting claims based on identical conduct.

45. *Id.* at 159–60.

the arbitration clause it adopted. As I understand it, Plenteous simply seeks now to have the Arbitrators quantify their earlier finding that Plenteous was entitled to damages under Swedish law for Xcelera's breach of promise. Plenteous's argument regarding the Exodus Transaction is that if Xcelera had honored its promise to obtain the Promised Consent, (1) the April and July Subscriptions would not have occurred without Plenteous's participation or may not have occurred at all, and that (2) in either event, Plenteous would likely have had the leverage to have been included in the Exodus Transaction alongside Xcelera. That is, Plenteous contends that the breach of promise that led to the April and July Subscriptions being consummated in the manner they were led to further consequential damages down the line in the Exodus Transaction.

If the defendants believe that Plenteous's claim for damages is an overly aggressive one in view of the Arbitrators' earlier Award or Swedish contract law, they must address that argument to the Arbitrators — and not this court. Having already ruled that they will not consider claims based on duties owed to Plenteous under Delaware law, the Arbitrators have displayed sensitivity to the limits of their role.

■ Furthermore, although the plaintiffs were less than completely straightforward in their previous arguments to this court, I cannot conclude that they waived Plenteous's right to have the Arbitrators reduce their damage award to a sum certain. The plaintiffs have not, in my view, ever definitively indicated that Plenteous would not seek an award of consequential damages in the Arbitration that reflects harm caused substantially, if not wholly, by certain of the Challenged Transactions, Indeed, their very desire to obtain that relief in the Arbitration was part of what convinced me earlier in this case that the plaintiffs' fiduciary duty claims fell within the scope of the arbitration clause. Moreover, Plenteous has not waived its right to seek contractual damages related to the Challenged Transactions by actively litigating fiduciary duty claims in this court because the Supreme Court permitted the plaintiffs to split their claims in this manner.

For all these reasons, I conclude that the defendants have not proven either that Plenteous is seeking to arbitrate non-arbitrable claims or that Plenteous has waived its right to arbitrate. This leaves Plenteous in the enviable position of being able to arbitrate while possessing evidence it discovered in this case and that would not necessarily have been discoverable in the Arbitration.[46] That prejudice, however, is lessened because the discovery in this case is, by order, to be used only in this case.

That said, I do believe that Plenteous's strategy calls out for some action. In attempting to defeat this motion, the plaintiffs volunteered that they would not complete the Arbitration until this matter was resolved so to avoid the possibility of inconsistent judgments.

---

**46.** In past cases, a party's decision to engage in litigation and receive discovery has been found to be inconsistent with the later assertion of arbitration rights. *Dorsey v. Nationwide General Ins. Co.,* 1989 WL 102493, at *1–2 (Del.Ch. Sept. 8, 1989). The difficulty with using this argument here is that the plaintiffs were openly pursuing relief in this court and in the Arbitration simultaneously, a strategy the Supreme Court found was authorized by the arbitration clause. Therefore, if the defendants wished permanently to cabin the use of discovery in this litigation, it was incumbent upon them to ask for appropriate relief, if they believed that the default provisions of this court's rules did not provide them with adequate protection.

Frankly, I think the plaintiffs have it precisely backwards. Having pressed ahead to obtain a finding of liability in the Arbitration, it seems to me to be more efficient for all concerned, including the Delaware courts, for the Arbitration to be finally completed before this court further considers this matter. Once the Arbitration is entirely completed, Plenteous will either be fully satisfied or not. The possibility exists that it may not even continue as a plaintiff in this action if it is satisfied with the Arbitrator's final decision. At the very least, any contractual recovery Plenteous receives will have to be considered if this court is called upon to shape a remedy for the plaintiffs in this case. Likewise, deferring this litigation until the Arbitration is final will permit me to determine the collateral effect, if any, of any findings made by the Arbitrators on a complete record.

Because of these and other related concerns, it makes sense to stay this litigation until the Arbitration is completed. Neither this court, nor the defendants, should have to address this case and risk the unnecessary possibility of inconsistent judgments, simply because the plaintiffs want to proceed on all fronts at once. Nor should the plaintiffs have the option to proceed almost all the way to the Arbitration finish line, and then ask this court to step in and hold a trial, while reserving the right to thereafter complete the Arbitration journey they had long ago begun. Lastly, none of the discovery in this action shall be used in the Arbitration absent an order from the Arbitrators allowing its use. In that instance only, I will amend the confidentiality order to permit the discovered information to be used in the Arbitration subject to appropriate confidentiality protections.

## IX. *Conclusion*

For the foregoing reasons, the defendants' motion for a permanent injunction is DENIED. This action shall be stayed in all respects until the completion of all proceedings in the Arbitration, including the expiration of any right, if any, on the part of any party to the Arbitration to seek review of the Arbitrators' final judgment, IT IS SO ORDERED.