# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HOLOGRAM, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0736-KSJM |
| | ) | |
| GREGORY CAPLAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 10, 2021
Date Decided:  December 14, 2021

Michael A. Barlow, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael C. Tu, Peter J. Brody, COOLEY LLP, Santa Monica, California; *Counsel for Plaintiff*.

Peter B. Ladig, Justin C. Barrett, BAYARD, P.A., Wilmington, Delaware; Kenneth S. Ulrich, W. Kyle Walther, GOLDBERG KOHN LTD., Chicago, Illinois; *Counsel for Defendant*.

**McCORMICK, C.**

Plaintiff Hologram, Inc. ("Hologram" or the "Company") has moved for a preliminary injunction to prevent defendant Gregory Caplan from pursuing arbitration against the Company. This decision grants the motion.

## I. FACTUAL BACKGROUND

The facts are drawn from Caplan's Answer,[1] the Original[2] and Supplemental[3] Declarations of Michael Barlow, the Declaration of Justin Barrett,[4] and the exhibits submitted with the declarations.

In the summer of 2013, Ben Forgan returned to Chicago after living in Australia. He was looking to start a business and reached out to Caplan, who he knew from high school.[5] At the time, Caplan had a vision for a company that would "provide mobile connectivity to hardware developers that wanted to tap into the internet of things who were struggling to do that in a simply turnkey way."[6]

Forgan and Caplan met at a coffee shop.[7] Caplan discussed his idea and the two began collaborating after the meeting.[8] Caplan recalls that the parties contemplated terms

---

[1] *See* C.A. No. 2021-0736-KSJM, Docket ("Dkt.") 14 ("Answer").

[2] Dkt. 28, Decl. of Michael A. Barlow ("Barlow Decl.").

[3] Dkt. 33, Supp. Decl. of Michael A. Barlow ("Barlow Supp. Decl.").

[4] Dkt. 31, Decl. of Justin C. Barrett ("Barrett Decl.").

[5] Barrett Decl. Ex. 1, Tr. of the Dep. of B. Forgan taken on Oct. 15, 2021 ("Forgan Dep. Tr.") at 53:23–54:5, 51:13–17.

[6] Barrett Decl. Ex. 2, Tr. of the Dep. of G. Caplan taken on Oct. 12, 2021 ("Caplan Dep. Tr.") at 40:15–18.

[7] Forgan Dep. Tr. at 56:14–57:2.

[8] Caplan Dep. Tr. at 65:22–66:16.

of their collaboration—that Forgan would own 90% and would serve as the company's President and CEO and that Caplan would own 10% in exchange for his ideas and connections.[9]

Forgan incorporated Konect Inc., which he later renamed Hologram, on October 21, 2013.[10] Two days later, on October 23, 2013, Forgan emailed Caplan three documents, including a proposed "Restricted Stock Purchase Agreement of Konekt Inc." (the "RSPA").[11]

The RSPA contemplated that Caplan would pay the Company $800 in cash for 800,000 shares over a four-year vesting period and would contribute any "intellectual property" he possessed "related to the company's business" to the entity.[12]

The RSPA defined the required means of acceptance, stating that any sale of shares must "occur at the principal office of the Company simultaneously with the execution and delivery of [the] Agreement by the parties and the payment of the total purchase price."[13]

Forgan's cover email transmitting the RSPA stated:

> Hey man – I need your signature on the file titled "caplan signature pages".
>
> These signatures are required for the Initial Stockholder Agreement, the restricted stock purchase agreement, and the indemnification agreement. I will also provide a

---

[9] Caplan Dep. Tr. at 64:12–22.

[10] *See generally* Forgan Dep. Tr. at 12:1–6.

[11] Barlow Decl. Ex. 3 ("Oct. 23, 2013 email") at GCAPLAN000088.

[12] *Id.*; Barlow Decl. Ex. 4 ("RSPA") §§ 1, 3.

[13] RSPA § 2 (emphasis added).

consultant/advisor agreement for your signature within the next 2 days.

You will also need to provide a check for $800 for the initial purchase of the shares (next week), which I can refund to you immediately following deposit [sic] the Konekt Inc. account.

Let me know [sic] you have questions on these, happy to hop on a call to discuss.[14]

In a one-sentence reply, sent just minutes after Forgan transmitted the offer, Caplan wrote: "We need to change these to non-vesting."[15] During his deposition, Caplan testified that, by sending this email, he believed that he was rejecting Forgan's offer.[16] Caplan contends that his response constituted a counteroffer.[17]

Forgan replied to Caplan's email, writing: "true, let me take care of that and get back to you," to which Caplan emailed: "Thanks."[18] Caplan testified that he understood Forgan's statement to mean that another draft of the documents was forthcoming.[19]

---

[14] Oct. 23, 2013 email at GCAPLAN000088.

[15] *Id.*

[16] Caplan Dep. Tr. at 108:2–5 ("Q: So when you responded, 'We need to change these to non-vesting,' were you in your mind rejecting the offer that was being made by Mr. Forgan? A: Yes").

[17] *Id.* at 108:8–12 ("Q: And did you understand that your response, 'We need to change these to non-vesting,' that that was indeed a counteroffer to the offer that you had just rejected? A: Yes.") (objection omitted).

[18] Oct. 23, 2013 email at GCAPLAN000088.

[19] Caplan Dep. Tr. at 110:5–8 ("Q: So from that response, did you understand that Mr. Forgan planned to send you a revised draft of these documents for your signature? A: That was my expectation.").

On October 24, 2013, Forgan reached out to counsel to discuss a change to the RSPA.[20]  On October 30, 2013, Forgan emailed his attorney about "timing" for new documents.[21]  Forgan never sent corrected documents to Caplan.[22]

Caplan admits that did not take any steps to pay and has never paid for his shares,[23] never signed any of the documents,[24] and never met at the Company's office to sign the RSPA.[25]  It is further undisputed that the Company never issued nor delivered stock to Caplan.[26]  And Caplan never appeared on the Company's capitalization table.[27]

In November 2013, however, Forgan sent an email suggesting that he and Caplan owned common stock of the Company.  Caplan has seized on that email in this litigation to support his position that he in fact owns common stock of the Company.  The email was to Sam Pessin and David Meis, who had offered to invest in the Company.[28]  Pessin and

---

[20] Barrett Decl. Ex. 4 (Privilege Log) at CTRL_1.

[21] *Id.* at CTRL_314.

[22] Caplan Dep. Tr. at 115:19–116:11.

[23] Barlow Decl. Ex. 5 (Caplan RFA Resp. No. 6) (admitting that Caplan has never paid any cash for his shares); Answer ¶ 34 ("Caplan did not pay $0.000125 per share [for] his stake in the Company").

[24] Barlow Decl. Ex. 5 (Caplan RFA Resp. Nos. 3–5) (admitting that Caplan did not sign the Proposed RSPA or "any other agreement or contract with the Company regarding his equity interest in the Company").

[25] Answer ¶ 34 (admitting that "the parties never met at the Company's office to execute the RSPA"); Caplan Dep. Tr. at 125:3–17.

[26] Answer ¶ 34 (admitting that "the Company never delivered to Caplan certificates of his shares in the Company").

[27] Barlow Decl. Ex. 18 (pre- and post-Series A capitalization tables, which do not list any interest by Caplan).

[28] Barlow Supp. Decl. Ex. 23.

Meis were close friends of Caplan, which Forgan knew.[29] While discussing the investment, Meis asked Forgan, "what type of shares do you and [Caplan] hold? . . . Common?"[30] Forgan responded "yes we hold common shares."[31] At his deposition, Forgan explained that he and Caplan "were in the process of attempting to sort out terms that would be mutually agreeable," that the email "should not be construed to mean that there was an agreement by which [they] actually both held shares at that point in time, and that he "misspoke" and "should have qualified that [statement] more[,] potentially."[32] Forgan's testimony comports with the rest of the evidence.

In late 2013 or early 2014, Forgan told Caplan that he needed to change the 90/10 split. Forgan told Caplan that it was not traditional for the market and that he "had been receiving feedback from potential investors that it was inappropriate."[33] Forgan offered Caplan 2.5% of the Company.[34] Caplan declined.[35]

On January 25, 2014, Forgan sent an email to Caplan on the Company's behalf, stating that "the company has not yet received fully-executed copies of the stock purchase agreements that I sent you in October (or a check for the purchase of that stock)."[36] He

---

[29] Caplan Dep. Tr. at 185:23–186:17.

[30] Barlow Supp. Decl. Ex. 23.

[31] *Id.*

[32] Forgan Dep. Tr. at 213:12–214:16.

[33] Caplan Dep. Tr. at 77:15–78:6; Forgan Dep. Tr. at 187:19–22.

[34] Forgan Dep. Tr. at 186:1–4.

[35] Caplan Dep. Tr. at 77:15–78:6.

[36] Barlow Decl. Ex. 6 (Jan. 25, 2014 email).

informed Caplan that "the company is taking the position that you have rejected the offer detailed in those documents," and, accordingly, "[a]ll offers for the purchase of common stock or preferred stock, whether oral or written, that I made to you at any time on the company's behalf are withdrawn."[37]

Caplan testified that, around the same time, he hired counsel in a "hope to finalize the contract that we had in a more built-out fashion."[38] Negotiations continued for a time but finally ended in April 2014. The Company wrote to Caplan's on April 23, 2014 that "Mr. Caplan never signed any agreements, Mr. Caplan never purchased or paid for any shares, and there was clearly never any meeting of the minds or binding agreement with respect to the issuance of shares to Mr. Caplan."[39]

Caplan then disappeared for nearly eight years. Other than a single text message to Forgan sent in May 2021, he had no further communications with the Company regarding his claimed ownership interest until August 2021.[40]

Meanwhile, Hologram grew in the intervening years. Recently, the Company raised a $65 million Series B investment from a prominent private equity firm.[41]

---

[37] *Id.*; *see also* Caplan Dep. Tr. at 206:4–17 (admitting that Forgan's statements of fact were correct).

[38] Caplan Dep. Tr. at 207:18–23.

[39] Barlow Decl. Ex. 7 (Apr. 23, 2014 letter between counsel).

[40] Barlow Decl. Ex. 5 (Caplan RFA Resp. No. 8); Caplan Dep. Tr. at 222:23–223:2; Barlow Decl. Ex. 8 (May 2021 text message from Caplan to Forgan saying "[h]eard things are going well – do I need to file paperwork or should we work something out?").

[41] Forgan Dep. Tr. at 221:20–22.

On August 4, 2021, just days before the Company publicly announced its successful Series B funding round, Caplan commenced a private arbitration against the Company by filing a demand with ADR Systems in Illinois.[42]

In the arbitration, Caplan claims that an agreement was formed when Forgan responded to Caplan's October 23, 2013 email, that this alleged agreement is comprised of all the terms of the RSPA except the vesting provision that Caplan rejected, and that, pursuant to the purported agreement, the Company is required to arbitrate Caplan's claim.[43] The RSPA contains mandatory Delaware choice of law and choice of forum provisions.[44] The applicable limitations period under Delaware law would likely bar Caplan's claims. The arbitration seems like a bid to avoid that outcome.[45]

---

[42] Barlow Decl. Ex. 9 (Arbitration Demand).

[43] The RSPA contains both an arbitration clause and a choice of forum provision providing that all litigation related to the contract will take place in Delaware state or federal court. *See* RSPA §§ 9(a), (k).

[44] RSPA § 9(a).

[45] Caplan also alleged for the first time at his deposition in this litigation held on October 12, 2021 that he believed he had an "oral contract," with Forgan based on a conversation he may have had sometime during the "late spring" or "summer of 2013." Caplan Dep. Tr. at 38:8–39:8 98:17–99:7, 99:20–100:9. Caplan could not remember many details of that conversation or that purported oral contract, the existence of which was not alleged in either his arbitration demand or any of his written discovery responses in this case. *Id.* at 63:4–65:1; *see also* Barlow Decl. Ex. 9 (Arbitration Demand); Barlow Decl. Ex. 10 (Interrog. Resp. No. 1) ("Caplan states that the Contract between him and the company consists of the [Proposed] Restricted Stock Purchase Agreement ('RSPA') and the email sent to Caplan by Forgan, on behalf of the Company, on or about October 23, 2013."). At oral argument, Caplan's counsel clarified that Caplan is not claiming the existence of an oral contract and is only relying on the RSPA and the October 23, 2013 email exchange as evidence of an agreement. In any event, the relevant statutes of limitations for oral contracts under both Delaware and Illinois law expired long ago. *See* 10 *Del. C.* § 8106 (three years); 735 Ill. Comp. Stat. 5/13-205 (five years).

In response to the arbitration, Hologram initiated this action seeking a declaration that Caplan's arbitration is improper because Hologram never agreed to arbitrate Caplan's claims against it.[46]

Hologram filed a motion for a preliminary injunction contemporaneously with the filing of its complaint to prevent Caplan from continuing to prosecute the Illinois arbitration. The parties agreed to stay arbitration until the earlier of the resolution of that motion or thirty days after the hearing that the court held on December 10, 2021.[47]

## II.    LEGAL ANALYSIS

Hologram has moved for a preliminary injunction based on its claim that Hologram never agreed to arbitrate the claims pending in the Illinois arbitration. "To obtain a preliminary injunction, a plaintiff must demonstrate (i) a reasonable probability of success on the merits; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction."[48] The Company has met each of these elements.

---

[46] *See* Dkt. 1, Verified Compl. for Prelim. and Permanent Inj. and Declaratory J. The Complaint seeks declaratory judgments on additional issues as well. Hologram seeks a declaratory judgment that Caplan's claim—which he brought nearly eight years after being informed of the Company's position that no contract exists and that Caplan has no right to purchase shares in Hologram—is barred by Delaware's three-year statute of limitations or, in the alternative, the doctrine of laches. Hologram also seeks a declaratory judgment on the alternative claim advanced in Caplan's demand—that the parties' October 23, 2013 correspondence constitutes an agreement to continue negotiating in good faith. Those claims are not before the court on Hologram's motion for a preliminary injunction.

[47] Dkt. 12.

[48] *Mountain W. Series of Lockton Cos. v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *9 (Del. Ch. June 20, 2019); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del.

8

## A. Hologram Is Likely to Succeed on the Merits.

Hologram is likely to succeed in proving that Hologram never agreed to arbitrate the claims at issue in the Illinois arbitration.

Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[49] "[A]ll essential or material terms must be agreed upon," and the parties must each overtly manifest their intent to be bound by the agreed terms.[50] Where one party seeks to compel another to arbitrate, it falls to that party to establish that any agreement between the parties contained an enforceable arbitration clause.[51]

Caplan claims that the RSPA, minus the vesting provision, combined with Forgan's "true. Let me . . . get back to you" email of October 23, 2013, constitute a binding agreement that includes a mandatory arbitration provision.[52] This claim is likely to fail for a number of reasons.

---

Ch. 2004) (weighing likelihood of success "even more heavily" where the "merits determination is, for all practical purposes, akin to a final ruling").

[49] *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[50] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–30 (Del. 2018) ("Under Delaware law, overt manifestation of assent—not subjective intent—controls the formation of a contract." (quotation marks omitted)).

[51] *See, e.g., State v. Philip Morris USA, Inc.*, 2006 WL 4782248, at *4 (Del. Ch. Dec. 12, 2006) ("Delaware law and federal law recognize that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (citations omitted).

[52] Barlow Decl. Ex. 10 (Interrog. Resp. No. 1); Barlow Decl. Ex. 9 (Arbitration Demand).

First, Caplan never accepted the terms of the RSPA as drafted. Caplan understood that he needed to sign the RSPA to "acknowledge [his] acceptance of the deal,"[53] but he did not do so. Instead, Caplan sent a short email saying that the RSPA needs to be non-vesting.[54] He understood that the terms of vesting were a material and "important" component of the offer.[55] He viewed his response as a counteroffer.[56] If Caplan's email was in fact a counteroffer,[57] then it constituted a rejection of Hologram's offer and terminated Caplan's right to accept Hologram's offer later.[58]

---

[53] Caplan Dep. Tr. at 102:10–16.

[54] *Id.* 108:2–12 ("Q: So when you responded, 'We need to change these to non-vesting,' were you in your mind rejecting the offer that was being made by Mr. Forgan? A: Yes, I was countering with a new offer, which was the same as that offer with that change based on what I believed it was. That was my action. Q: And did you understand that your response, 'We need to change these to non-vesting,' that that was indeed a counteroffer to the offer that you had just rejected? A: Yes, I did."); *see also* Forgan Dep. Tr. at 182:11 (Forgan testifying that "Greg rejected the initial offer").

[55] Caplan Dep. Tr. at 106:12–14 ("Q: Was having shares without a vesting condition important to you? A: Yes."); *id.* at 118:21–23 ("Q: You considered the vesting provision to be important; is that a fair statement? A: Yes."); *see also CertiSign Hldg., Inc. v. Kulikovsky*, 2018 WL 2938311, at *19 n.209 (Del. Ch. June 7, 2018) (in stock option context, "vesting" is a "material term").

[56] Caplan Dep. Tr. at 102:20–21 ("A: I countered the offer with a new offered [sic] based on the terms that we had previously agreed to."); *id.* 108:5–12 ("A: Yes, I was countering with a new offer, which was the same as that offer with that change based on what I believed it was. That was my action. Q: And did you understand that your response, 'We need to change these to non-vesting,' that that was indeed a counteroffer to the offer that you had just rejected? A: Yes, I did.").

[57] It is difficult to conclude that Caplan's email contained sufficiently definite terms so as to constitute a counteroffer. Caplan did not propose terms, other than on the issue of vesting. Caplan Dep. Tr. at 109:1–23. Nor did he express that he would sign the RSPA or either of the other contracts if the vesting provision were removed. *Id.* at 109:1–23.

[58] *Sandcastle Realty, Inc. v. Castagna*, 2006 WL 2521437, at *2 (Del. Ch. Aug. 16, 2006) (holding that under Delaware law "a response to an offer that is not on the terms set forth

10

Second, Delaware law requires a meeting of the minds for contract formation.[59] So, Forgan needed to accept the counteroffer for the parties to have formed a contract. Forgan's reply does not evidence acceptance. Although Forgan responded "true," he followed that with the statement that he would "get back to" Caplan. Under any reasonable reading, Forgan was indicating that another draft of the agreement would be necessary and forthcoming. Caplan understood as much.[60] He knew that their dealings were incomplete and "believed that there would be further follow-up."[61] Courts confronted with such a situation—where a party promised to "get back to" the other with contract language—have consistently concluded that while the parties' correspondence might show assent to a particular term, such statements do not manifest mutual consent to contract.[62]

---

by the offeror constitutes a rejection of the original offer and a counter-offer. . . . Because it stated new terms not in the [original] offer, [the] response was a counter-offer and [] a rejection").

[59] *See, e.g.*, *Skinner v. Peninsula Healthcare Servs., LLC*, 2021 WL 778324, at *3 (Del. Super. Ct. Mar. 1, 2021) ("Under Delaware law, contract formation requires mutual assent, meaning a complete meeting of the minds of the parties.").

[60] Caplan Dep. Tr. at 110:1–8 ("Q: So then Mr. Forgan responds to your email saying, 'True, let me take care of that and get back to you.' Do you see that? A: Yes, I do. Q: So from that response, did you understand that Mr. Forgan planned to send you a revised draft of these documents for your signature? A: That was my expectation.").

[61] *Id.* at 110:20–111:4.

[62] *See, e.g.*, *AMC Tech., LLC v. Cisco Sys., Inc.*, 2013 WL 3559807, at *8 (N.D. Cal. July 11, 2013) (noting that "Uliano even explicitly says 'I'll [talk to the team and] get back to you,' *rather than words of assent*" (emphasis added)); *Hammond v. Grengs*, 2021 WL 856081, at *3 (Minn. Ct. App. Mar. 8, 2021) (statements that a "fully-executed" contract was required and that party would "have [his] lawyers review" a proposal and "would 'get back to'" the counterparty meant that the parties' email exchange did not form a valid agreement); *Spectrum Glass Co. v. Pub. Util. Dist. No. 1. of Snohomish Cty.*, 2005 WL 1580042, at *6–7 (Wash. Ct. App. July 5, 2005) (response to proposal regarding payment

Third, Caplan never formalized the deal. Caplan never attended a meeting at the Company's headquarters to sign the agreement, signed any of the documents, nor attempted to pay for the shares, as the supposed agreement required.[63] Nor did Caplan accept or sign either of the other two documents that were part of the package constituting the Company's offer.[64]

Fourth, the parties' after-the-fact conduct provides circumstantial evidence that no agreement was reached in 2013.[65] The parties continued their negotiations through the spring of 2014.[66] During that period, Hologram consistently maintained that no agreement was formed on October 23, 2013. Forgan explained, on January 25, 2014, that because Caplan had not accepted the offer, the Company was withdrawing it.[67] On April 23, 2014,

---

term consisting only of "I'll get back to you" was insufficient to show acceptance of payment term); *see also Roh v. Devack*, 2009 WL 3347105, at *1, *3 (D. Conn. Oct. 14, 2009) (denying summary judgment on claim that "I agree to the 2.85 Million. We will get back to you soon with what terms we can offer" constituted an agreement; holding that while the defendant's email "accept[s] the price term," it "clearly contemplates that additional negotiation as to other terms is still required, and advises Plaintiff of such.").

[63] Answer ¶ 34; Caplan Dep. Tr. at 116:12–22; Barlow Decl. Ex. 5 (RFA Resp. Nos. 3–6).

[64] *See* October 23, 2013 email. *See also* Barlow Decl. Ex. 14 (Initial Stockholder Agreement); Barlow Decl. Ex. 15 (indemnification agreement).

[65] *See Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *20 (Del. Ch. Sept. 30, 2014) (holding that there was no enforceable agreement where, among other things, "the parties' after-the-fact conduct" revealed that "Defendants did not share Plaintiffs' understanding and apparently never had"); *Kotler v. Shipman Assocs.*, 2019 WL 4025634, at *17–18 (Del. Aug. 21, 2019) (no contract existed where the parties' subsequent conduct evidenced no meeting of the minds).

[66] *See, e.g.*, Barlow Decl. Ex. 6 (asking, in a January 2014 email from Forgan to Caplan, to set a time to "continue our conv[ersation]" regarding Caplan's investment).

[67] Barlow Decl. Ex. 6.

Hologram again confirmed that Caplan had "rejected the offer" previously made in October 2013, and that "there was clearly never any meeting of the minds or binding arrangement with respect to the issuance of shares to Mr. Caplan."[68]

Hologram's position after this time period was consistent with its statements in the January 25 and April 23, 2014 emails. Caplan never received a stock certificate from the Company.[69] Caplan never appeared on the Company's capitalization table.[70] The Company also sent letters to post-2014 investors promising to issue them additional shares if Caplan re-appeared and successfully asserted a claim.[71] Such an issuance would have come out of the Company's reserve of shares and would have diluted the interest of early investors, including Forgan, thereby allocating the risk of loss from Caplan's claim to itself and those early investors.[72] As such, the Company's letter would have only made sense if it understood that Caplan was not entitled to purchase any shares. Indeed, Forgan testified that the letters were issued in "an overabundance of caution," at the request of later investors, and that he was willing to carry the risk of loss because he did not "think there's any merit to [Caplan's] claims," and thus "saw no harm in it."[73]

---

[68] Barlow Decl. Ex. 7.

[69] Barlow Decl. Ex. 5 (RFA Resp. 7).

[70] Barlow Decl. Ex. 18 (tables).

[71] Barlow Decl. Ex. 19 ¶ 2.

[72] *Id.*; *see also* Barlow Decl. Ex. 18 (pre- and post-Series A capitalization tables, which do not list any interest by Caplan).

[73] Forgan Dep. Tr. at 223:15–22; *see also* Barlow Decl. Ex. 20 (Forgan explaining to an investor in December 2015 that the letter "is just in place because" Caplan "made a frivolous claim that he owned 10% of the company in 2013").

13

Fifth, Forgan could not have accepted any counteroffer by email. Under Delaware law, "the offeror is the 'master of his offer,' and may specify" the only valid means of acceptance.[74] The RSPA specifies the time, place, and manner of valid acceptance (simultaneously with payment, at the Company's headquarters, and in writing).[75] Because Caplan's current theory is that he did not modify any of the terms of the RSPA other than with respect to vesting, the counteroffer that Caplan now contends he made incorporated all of the terms of the document, including its specifications as to the means of acceptance. Accordingly, Caplan's alleged offer was required to be accepted simultaneously with the exchange of payment, at the company's headquarters, and in writing. As such, Caplan's counteroffer foreclosed the possibility of acceptance by email.[76] Thus, even assuming that Caplan made a counteroffer on the terms he now claims, by those terms Forgan's email was legally insufficient to accept it.[77]

---

[74] *Eaton v. Eaton*, 2005 WL 3529110, at *6 n.38 (Del. Ch. Dec. 19, 2005) (citing 2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 6.26 (4th ed. 1991); *see also Montgomery v. Achenbach*, 2007 WL 1784080, at *2 (Del. Super. Ct. May 17, 2007) ("The offeror may impose as many conditions or terms as they choose, including but not limited to conditions concerning time, place, and method of acceptance.").

[75] RSPA §§ 1, 2.

[76] *Cf. Montgomery*, 2007 WL 1784080, at *2 (time limit in offer cuts off ability to accept after deadline).

[77] *See, e.g.*, *Grunstein v. Silva*, 2014 WL 4473641, at *31 (Del. Ch. Sept. 5, 2014) (no contract, even where offeror "honestly believed" there was a deal, because offeree's "failure to respond to an offer as explicitly set forth in the proposal was an implicit rejection"; offer "explicitly conditioned its effectiveness upon receipt . . . of an executed copy," but the offeree never signed).

In sum, Caplan never accepted the Company's offer, and if Caplan's October 23, 2013 email can be construed as a counteroffer, it was never accepted. No written agreement was formed.

**B.    Hologram Has Demonstrated a Likelihood of Irreparable Harm.**

Unless an enforceable contract exists on the terms that Caplan now asserts, Caplan has no valid basis to force the Company to arbitrate his claims against it. It is well-established Delaware law that "wrongful enforcement of an arbitration clause constitutes sufficient irreparable harm to justify an injunction."[78] Accordingly, without an injunction, Hologram will be irreparably harmed by having to litigate Caplan's claims in a private arbitration in Illinois, a forum to which it never consented.

**C.    The Equities Favor Preliminary Injunctive Relief.**

The equities tilt in Hologram's favor. The hardship Hologram will suffer if injunctive relief is denied, and if Caplan is allowed to proceed in arbitration, would be greater than any hardship Caplan will suffer if the requested relief is granted. Further, Caplan's harm from the entry of an injunction pending the resolution of this action will be minimal at most. On the one hand, if an injunction is entered and Hologram prevails on the merits, then Caplan will have no cognizable harm from the delay—the injunction will

---

[78] *Brown v. T-Ink, LLC*, 2007 WL 4302594, at \*16 (Del. Ch. Dec. 4, 2007) (finding irreparable harm when the wrongful arbitration was only "threatened"); *see also, e.g.*, *AffiniPay LLC v. West*, 2021 WL 4262225, at \*10 (Del. Ch. Sept. 17, 2021) (reciting the holding of *Brown* and finding irreparable injury); *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 842 A.2d 1245, 1259 (Del. Ch. 2004) ("[I]t is well settled that parties cannot be required to arbitrate non-arbitrable claims and that the procession of an unwarranted arbitration poses the threat of irreparable injury to the party rightfully resisting arbitration.").

have served to prevent him from asserting a right that he never had. On the other hand, if an injunction is entered and then Caplan prevails on the merits, his only harm will come from the delayed recognition of his right to proceed in arbitration. That harm cannot be great; after all, Caplan waited almost eight years from the 2013 negotiation to bring his arbitration in the first place.

## III. CONCLUSION

Hologram's motion for a preliminary injunction is GRANTED. Hologram must post a bond under Court of Chancery Rule 65(c). Because the "costs and damages" Caplan will incur if this motion is later determined to have been improvidently granted approach zero, a nominal security is appropriate. The parties shall confer on a form of order implementing this decision.