# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRY FRIDDLE, BRUCE GEBHARDT, HENRY GORDON, JEFFREY GREEN, BARRY HAWK, ROBERT JONES, PATRICK PARKER, SHANNON SMITH, and CRESSON TECHNOLOGY INVESTORS GP, LLC, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0306-SG |
| CHRISTOPHER MOEHLE, ROBOTICS HUB FUND 1, LLC, and COAL HILL VENTURES, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ROBOTICS HUB FUND 1, LLC, | ) ) | |
| Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| TERRY FRIDDLE, BRUCE GEBHARDT, HENRY GORDON, JEFFREY GREEN, BARRY HAWK, ROBERT JONES, PATRICK PARKER, SHANNON SMITH, and CRESSON TECHNOLOGY INVESTORS GP, LLC, | ) ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 13, 2023
Date Decided: February 8, 2024

Thad J. Bracegirdle and Emily L. Skaug, BAYARD, P.A., Wilmington, Delaware; OF COUNSEL: Brian A. Katz and John G. Moon, OLSHAN FROME WOLOSKY LLP, New York, New York, *Attorneys for Plaintiffs and Counterclaim Defendants Terry Friddle, Bruce Gebhardt, Henry Gordon, Jeffrey Green, Barry Hawk, Robert Jones, Patrick Parker, Shannon Smith, and Cresson Technology Investors GP, LLC*.

Steve L. Caponi and Matthew B. Goeller, K&L GATES LLP, Wilmington, Delaware; OF COUNSEL: Christopher M. Verdini, K&L GATES LLP, Pittsburgh, Pennsylvania, *Attorneys for Defendants Christopher Moehle, Robotics Hub Fund I, LLC, and Coal Hill Ventures, LLC, and Counterclaim Plaintiff Robotics Hub Fund 1, LLC*.

**GLASSCOCK, Vice Chancellor**

As our Supreme Court has recently opined, "[t]he courts of this State hold freedom of contract in high—some might say, reverential—regard."[1] This sentiment applies with especial weight to agreements to arbitrate, in that they carry the dual policy avoirdupois of respecting private ordering and promoting alternative dispute resolution. So much is this the case that our courts typically refer to such agreements, and specific enforcement thereof, as depriving the courts of jurisdiction.[2]

It is axiomatic, however, that rights established by agreement may be waived by agreement as well. The scope of such a waiver is at issue here.

This litigation began in 2021. The initial complaint, and the subsequent counterclaims, involved a discrete set of issues, addressing whether one defendant had been validly removed as General Partner of a limited partnership, the "Fund." The Fund was subject to a limited partnership agreement, under which the issues above were unambiguously subject to mandatory arbitration. The parties, content, apparently, to have the matter settled in Chancery, agreed to waive the arbitration provision, to allow "the complete resolution of their disputes before this Court."

---

[1] *Cantor Fitzgerald, L.P. v. Ainslie*, 2024 WL 315193, at *1 (Del. Jan. 29, 2024).
[2] As Vice Chancellor Laster recently pointed out in a scholarly review of the issue, this shorthand is, in fact, a misnomer. *See Gandhi-Kapoor v. Hone Capital LLC*, 2023 WL 8165594 (Del. Ch. Nov. 22, 2023).

1

In 2023, Plaintiffs filed an amended complaint. That complaint introduces new claims, for breach of contract and fiduciary duty. Defendants have moved to dismiss the new claims, arguing that these tort claims are subject to the mandatory arbitration provision. Plaintiffs contend that the arbitration waiver applies to these new claims as well.

The issue is a simple one of construing the breadth of the waiver filed by the parties. The parties agreed to waive arbitration for "their disputes before this Court." Plaintiffs argue that the tort claims had attached as of the time of the waiver or resulted from the dispute between the parties, and therefore constitute a portion of the parties' dispute at the time. Defendants counter that they only waived the "disputes before this Court"—that is, the disputes set forth in the Complaint and Counterclaims about whether the General Partner had been validly removed. Defendants aver that they did not intend to waive unknown claims, whether those claims had attached at the time of the agreement or not.

I find the waiver unambiguous. The only claims "before this Court" were the ones inhering in the pleadings at that time, as set out in the Complaint and Counterclaims. To the extent ambiguity did reside in the waiver agreement, moreover, it would be consistent with public policy to construe the waiver narrowly, rather than subject Defendants to an unintended forfeiture of the right to mandatory

2

arbitration. Accordingly, the tort claims are dismissed, subject to arbitration consistent with the Partnership Agreement. I explain more fully, below.

## I. BACKGROUND

*A. Factual Background[3]*

### 1. The Fund

In 2015, Christopher Moehle formed RHFI LLC[4] and Coal Hill to begin an investment fund with an emphasis on early-stage robotics companies.[5] At that time, Moehle also formed a Delaware limited partnership, Robotics Hub Fund 1, LP (the "Fund"), that was to be the investment vehicle.[6] Coal Hill, which is solely owned and controlled by Moehle, served as the investment manager of the Fund.[7] The Fund maintains investments in seven portfolio companies.[8]

The Fund's limited partnership agreement (the "Partnership Agreement"), designated RHF1 LLC as the General Partner.[9] Under the terms of the Partnership Agreement, RHF1 LLC shall cease to be the Fund's General Partner if a "Disabling Event" transpires.[10] In the event that RHF1 LLC is removed due to the occurrence

---

[3] The facts in this section are drawn from the First Amended Complaint. For purposes of Defendants' motion to dismiss, I accept as true the allegations Plaintiffs assert in the First Amended Complaint.

[4] Undefined capitalized terms herein have the same meaning as in my February 25, 2022 memorandum opinion. *See Friddle v. Moehle*, 2022 WL 20651183 (Del. Ch. Feb. 25, 2022).

[5] First Am. Compl. ¶ 28, Dkt. No. 54 ("Am. Compl.").

[6] *Id.* ¶¶ 24–26.

[7] *Id.* ¶ 25.

[8] *Id.* ¶ 29.

[9] *Id.* ¶¶ 24–26.

[10] *Id.* ¶¶ 42–44.

of a Disabling Event, the Fund will be dissolved unless a "Majority in Interest agrees in writing to continue the business of the [Fund] and to the appointment . . . of another General Partner" within 90 days of the Disabling Event.[11] Regarding each limited partner's interest, the Partnership Agreement allows the termination thereof if the limited partner's continued participation in the Fund would "result in any material adverse consequences to the Partnership or its Limited Partners."[12]

With respect to fiduciary duties, the Partnership Agreement provides that "the General Partner shall act consistent with its fiduciary duties to the Limited Partners."[13] The Partnership Agreement dictates that "the Partnership, the General Partner, and the Principals shall at all times act consistently with their fiduciary duties to the Partners."[14] "Principal" is defined to include Moehle.[15]

### 2. The Sidecar Investments

Defendants offered Plaintiffs the opportunity to invest in the Fund's portfolio companies ("Sidecars") through Coal Hill and RHF1 LLC.[16] The investments in the Sidecars were separate from Plaintiffs' investments in the Fund and governed by Sidecar Agreements.[17] The Sidecar Agreements contain language similar to the

---

[11] *Id.* ¶¶ 42–44.
[12] Answer Verified Compl. and Verified Countercls. Ex. A, § 5.06(a), Dkt. No. 8 (the "Partnership Agreement").
[13] Am. Compl. ¶ 39 (quoting Partnership Agreement § 3.06(d)).
[14] *Id.* (quoting Partnership Agreement § 3.06(e)).
[15] Partnership Agreement Art. I.
[16] Am. Compl. ¶ 1.
[17] *Id.* ¶¶ 1–2.

Partnership Agreement pertaining to fiduciary duties, stating that "the General Partner shall act consistent with its fiduciary duties to the Limited Partners."[18]

### 3. Financial Disclosures Under the Partnership Agreement and Sidecar Agreements

The Partnership Agreement and Sidecar Agreements provide that Plaintiffs will receive an annual disclosure of investment activity and financial reporting.[19] These disclosures are to be disseminated within four months of the close of the fiscal year, or "as soon thereafter as reasonably possible."[20] The transmission of these reports to Plaintiffs, however, was routinely delayed by seven or eight months.[21] For example, Plaintiffs did not receive the 2019 financial statements until January 2021.[22]

As limited partners of the Fund, Plaintiffs also expected to receive quarterly statements about the net asset value of the Fund's portfolio companies.[23] These statements, however, were routinely late or never issued.[24] Those statements that were issued often lacked financial analysis of the portfolio companies.[25] Moehle claimed these omissions were due to the portfolio companies' refusal to share such

---

[18] *Id.* ¶ 40.
[19] *Id.* ¶ 61.
[20] *Id.* (quoting Partnership Agreement § 7.02(a)).
[21] *Id.* ¶¶ 62, 64.
[22] *Id.* ¶ 64.
[23] *Id.* ¶ 65.
[24] *Id.* ¶¶ 65, 80.
[25] *Id.* ¶¶ 66, 81–82.

5

information, but representatives of some of the portfolio companies evidenced a willingness to share the information.[26] The information that was included in these statements was often false or misleading,[27] as Moehle described the present value of the Fund's portfolio as "exceptional" while valuing the majority of the portfolio companies at "cost."[28]

With respect to the Sidecar investments, Defendants never provided Plaintiffs with quarterly statements of the net asset value.[29]

### 4. Management of Fund Assets

In his role as a principal of the Fund, Moehle invoiced non-Fund expenses to Coal Hill, the investment manager of the Fund.[30] Despite being separate entities with different partners, the administrative costs for the Sidecar investments were also allocated to the Fund's limited partners.[31]

In 2017, Coal Hill requested that the limited partners prepay management fees to enable the Fund to hire additional staff.[32] The limited partners continued to be charged these advance management fees through 2019, prepaying approximately $600,000.[33] The new employees whose salaries these prepaid fees were meant to

---

[26] *Id.* ¶¶ 66–68.
[27] *Id.* ¶ 69.
[28] *Id.* ¶ 70.
[29] *Id.* ¶¶ 79–80.
[30] *Id.* ¶ 85.
[31] *Id.* ¶¶ 107–08.
[32] *Id.* ¶¶ 90–92.
[33] *Id.* ¶¶ 96–99.

pay were never hired by the Fund.[34]   Instead, Coal Hill used these prepaid management funds to pay Moehle's personal legal fees.[35]  Moehle also borrowed $150,000 from the Fund, the reason for which has not been disclosed[36] and Moehle charged the Fund for international trips that were unrelated to the Fund's business by misrepresenting the business purposes of the trips.[37]

As a result of these activities, the Fund lacks liquidity to cover its operation costs.[38]

### 5. The Conflicted Transactions

In 2015, prior to forming the Fund, Moehle created JDV Robotics ("JDV").[39] Moehle concealed his involvement in JDV from Plaintiffs by claiming JDV was owned by the University of Pittsburgh Medical Center.[40] However, JDV's registered corporate address is Moehle's home address and Moehle is listed the sole officer of JDV.[41]

---

[34] *Id.* ¶¶ 93–94, 100.
[35] *Id.* ¶¶ 90, 102–04.
[36] *Id.* ¶¶ 86–88.
[37] *Id.* ¶ 105.  For example, Moehle billed the Fund for an April 2019 trip to Dubai to review collaborations that several portfolio companies had entered into in the region, however, the portfolio company named in the update to explain the trip has no such collaborations in Dubai. *Id.* ¶ 106.
[38] *Id.* ¶¶ 109–12.
[39] *Id.* ¶ 115.
[40] *Id.* ¶ 116.
[41] *Id.* ¶ 117.

Once the Fund was formed, Moehle caused the Fund to enter into a convertible note with JDV, whereby the Fund loaned JDV $200,000.[42] Moehle signed the convertible note on behalf of both the Fund and JDV.[43] This loan to JDV also included a $50,000 consulting fee paid to Moehle from JDV.[44] Despite JDV's insolvency, Moehle caused the Fund to extend credit by claiming that Fund's JDV notes had more favorable terms than other portfolio companies.[45] The Fund has not disclosed its investment in JDV, nor does the Fund list JDV as one of its portfolio companies.[46]

In October 2017, Moehle, through his control of Coal Hill, also merged Robotics Hub Special Purpose Vehicle ("RHSPV") interest, worth $125,000, into the Fund.[47] Coal Hill earned a 12% annual return from the Fund from this transaction.[48] Prior to the merger, Coal Hill's investment in RHSPV was maintained on an interest-free loan from the Fund since late 2016.[49] These transactions resulted in Moehle, through his control of Coal Hill, earning 12% return on the limited partners' capital, without compensating the Fund.[50] Moehle further asserted his

---

[42] *Id.* ¶ 115.
[43] *Id.*
[44] *Id.* ¶ 118.
[45] *Id.* ¶ 123.
[46] *Id.* ¶ 121.
[47] *Id.* ¶ 124.
[48] *Id.*
[49] *Id.*
[50] *Id.*

control to ensure that the merger date was delayed to maximize his personal profit from the transaction.[51]

In 2019, Moehle represented to some of the Fund's portfolio companies that he would raise funds for them through investment opportunities offered to RHF1 investors.[52] Plaintiffs, who were RHF1 investors, were not informed of these offerings.[53] Instead, Moehle created another fund, "The Robotics Hub Fund 2, LP," to make these additional investments into the Fund's portfolio companies.[54] The investors who gave "The Robotics Hud Fund 2, LP" funds were given preemptive rights to purchase future issuance of equity securities.[55] Plaintiffs were not given the opportunity to invest in this separate fund and, as a result of the creation of "The Robotics Hud Fund 2, LP," Plaintiffs' holdings in the portfolio companies were diluted.[56] Thereafter, Moehle informed the Fund's limited partners that the Fund was closed.[57] At that time, the Fund's assets comprised $8 million.[58]

---

[51] *Id.*
[52] *Id.* ¶ 125.
[53] *Id.*
[54] *Id.* ¶¶ 125–26.
[55] *Id.* ¶ 126.
[56] *Id.* Defendants further diluted Plaintiffs' holdings by creating other new entities that utilized the Fund's pro rata investment rights and Moehle's relationships with the portfolio companies. *Id.* ¶ 131. These new entities had a 20% carry to Moehle compared to the 10% carry associated with the Fund Sidecars in which the Limited Partners had invested. *Id.*
[57] *Id.* ¶ 130.
[58] *Id.*

### 6. Litigation Ensues Regarding a "Disabling Event"

In March 2021, Plaintiffs purportedly removed RHF1 as General Partner following the alleged occurrence of a "Disabling Event" under the Partnership Agreement; the nature of the "event" is discussed below.[59] Plaintiffs notified RHF1 of its removal on March 15, 2021.[60] Cresson GP was chosen as the Fund's new general partner and, using its purported authority as the general partner, removed Coal Hill as the Fund's manager.[61]

When RHF1 refused to accept its removal as General Partner of the Fund,[62] Plaintiffs initiated this action by filing a complaint (the "Complaint") on April 12, 2021,[63] along with a motion to expedite.[64] Defendant RHF1 filed counterclaims (the "Counterclaims") challenging the validity of its purported termination as the General Partner of the Fund.[65] On May 20, 2021, the parties submitted a joint letter to the Court explaining that, while the Partnership Agreement contained a mandatory arbitration provision, the parties "mutually agreed to waive the arbitration provision to permit the complete resolution of their disputes before this Court."[66] The matter

---

[59] *Id.* ¶¶ 134–35.
[60] *Id.* ¶ 135.
[61] *Id.* ¶ 137.
[62] *Id.* ¶ 141.
[63] Verified Compl., Dkt. No. 1.
[64] Pls.' Mot. for Expedited Proceedings, Dkt. No. 2.
[65] *See* Answer Verified Compl. and Verified Countercls., Dkt. No. 8.
[66] Joint Letter to Vice Chancellor Glasscock, Dkt. No. 15 (the "Joint Letter").

was expedited that same day.[67]  The parties filed cross-motions for judgment on the pleadings on July 21, 2021.[68]

The parties requested that the Court determine whether an operative complaint filed in federal court by a former board member of the Moehle entities (the "Operative Complaint") against Defendants in the instant case was a "Disabling Event," as defined by the Partnership Agreement, which would automatically remove RHF1 LLC as the Fund's General Partner.[69]  On February 25, 2022, I issued a memorandum opinion granting Defendants' motion for judgment on the pleadings and denying Plaintiffs' motion for partial judgment on the pleadings.[70]  I determined that the Operative Complaint did not meet the contractual definition of a Disabling Event.[71]  Since the counts contained in Plaintiffs' original complaint all arose from Plaintiffs' contention that the Operative Complaint was a Disabling Event, I dismissed Counts I, II, and III.[72]  The February 25, 2022 memorandum opinion did not resolve Plaintiffs' motion to dismiss the Counterclaims brought by RHF1 LLC.[73]

On September 13, 2022, Defendants notified Plaintiffs that they had "been removed from the Fund effective May 31, 2021, and [Plaintiffs'] limited partnership

---

[67] *See* Tr. Tel. Scheduling Conf. 3:20–23, Dkt. No. 22.
[68] *See* Defs.' Countcl. Pl.'s Mot. J. Pleadings, Dkt. No. 26; Pls.' Mot. Partial J. Pleadings, Dkt. No. 27.
[69] *Friddle v. Moehle*, 2022 WL 201651183, at *3–4.
[70] *See id.* at *11.
[71] *Id.* at *5–10.
[72] *Id.* at *11.
[73] *See id.* at *1 n.2.

11

interests have been terminated."[74] Plaintiffs were not provided consideration for the termination of their interests.[75]

*B. Procedural Posture*

On March 8, 2023, Plaintiffs filed a motion for leave to file an amended complaint.[76] The parties fully briefed the motion and I heard oral arguments on May 10, 2023.[77] I granted Plaintiffs' request to file an amended complaint.[78] In doing so, I withheld a ruling determining whether there had been a waiver of the binding arbitration clause with respect to any newly asserted claims in the forthcoming amended complaint.[79]

Plaintiffs filed the amended complaint (the "Amended Complaint") on June 2, 2023.[80] The Amended Complaint realleges Counts I–III[81] and includes two new counts: Count IV for breach of fiduciary duty and Count V for breach of contract.[82] Both claims are predicated on Moehle's alleged misuse of the Fund's assets and Defendants' purported termination of Plaintiffs as limited partners in September

---

[74] Am. Compl. ¶ 142.
[75] *Id.* ¶ 143.
[76] Pls.' Mot. for Leave to File First Am. Verified Compl., Dkt. No. 47.
[77] *See* Judicial Action Form re: Tel. Mot. before Vice Chancellor Sam Glasscock dated 5.10.23, Dkt. No. 106.
[78] *See id.*
[79] *See id.*
[80] *See* Am. Compl.
[81] Plaintiffs reallege these already-dismissed counts for the purpose of preserving Plaintiffs' right to appeal. *See* Am. Compl. 1 n.1.
[82] Am. Compl. ¶¶ 162–69.

12

2022.[83]  On July 28, 2023, Defendants filed a motion to dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6).[84]  The parties finished briefing Defendants' motion on October 13, 2023.[85]  I heard oral arguments on November 13, 2023.[86]  I consider the matter fully submitted as of that date.[87]

## II. ANALYSIS

The Partnership Agreement provides that "[a]ll disputes between the Partners arising under this Agreement will be resolved by arbitration in the county and state in which the General Partner maintains its principal office at the time the request for such arbitration is made . . . ."[88]  The parties agree that this is a valid arbitration clause.[89]  Nor is there a dispute that Counts IV and V are within the scope of the arbitration clause.[90]  Rather, the parties dispute whether their joint letter to the Court, dated May 20, 2021 (the "Joint Letter"), constitutes a valid waiver of Defendants'

---

[83] *Id.* ¶¶ 164, 168.

[84] Defs.' Mot. to Dismiss Pls.' First Am. Compl., Dkt. No. 98.

[85] *See* Defs.' Reply Supp. Defs.' Mot. to Dismiss First Am. Compl., Dkt. No. 104.

[86] *See* Judicial Action Form re: Oral Arg. before Vice Chancellor Sam Glasscock dated 11.13.23, Dkt. No. 107.

[87] During the November 13, 2023 oral arguments, I declined to hear arguments with respect to RHF1's counterclaims.  Instead, I requested that the parties submit a letter explaining the status of those claims in light of my February 25, 2022 memorandum opinion and what impact, if any, my decision on Defendants' motion to dismiss the Amended Complaint would have on the outstanding counterclaims.  The parties submitted the requested letter on November 28, 2023.  *See* Letter to The Hon. Sam Glasscock III, Dkt. No. 108.

[88] Partnership Agreement § 9.05(a).

[89] Opening Br. Supp. of Defs.' Mot. to Dismiss Pls.' First Am. Verified Compl. 9, Dkt. 98 ("Defs.' OB"); *see* Pls.' Answering Br. Opp'n Defs.' Mot. to Dismiss 15–19, Dkt. No. 101 ("Pls.' AB").

[90] Defs.' OB 9–10; *see* Pls.' AB 15–19.

13

ability to enforce the arbitration provision with respect to these two new counts.[91] Before I can address whether the Amended Complaint should be dismissed for failure to state a claim, I must first determine whether Defendants have waived their right to enforce the Partnership Agreement's mandatory arbitration provision.

### A. Rule 12(b)(1) and Waiver of the Mandatory Arbitration Provision

Under Court of Chancery Rule 12(b)(1), the Court routinely dismisses claims that are subject to a valid arbitration agreement.[92] An arbitration provision, like any contractual provision, can be waived if the parties consent.[93] "Waiver of arbitration is a matter of intention and to constitute a waiver there must be an intentional relinquishment of a right with both knowledge of its existence and intention to relinquish it."[94] While "waiver may be express or implied"[95] the waiver of an arbitration provision requires "clear and convincing evidence[.]"[96] Arbitration is strongly favored under Delaware law and policy,[97] so "waiver is not lightly inferred."[98]

---

[91] *See* Defs.' OB 10; Pls.' AB 15–16.

[92] *See Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *4 (Del. Ch. Mar. 28, 2013) ("[A] Rule 12(b)(1) motion will be granted if the parties contracted to arbitrate the claims asserted in the complaint.").

[93] *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 842 A.2d 1245, 1260 n.39 (Del. Ch. 2004)

[94] *James Julian, Inc. v. Raytheon Serv. Co.*, 464 A.2d 665, 668 (Del. Ch. 1980) (quoting 6 C.J.S. *Arb.* § 37 (1975)).

[95] *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009).

[96] *Zaret v. Warners Moving Storage*, 1995 WL 56708, at *1 (Del. Ch. Feb. 3, 1995).

[97] *Fraternal Order of Police Del. Lodge 10*, 2017 WL 6055375, at *2 (Del. Ch. Dec. 7, 2017) ("[F]avoring arbitration is a clearly defined public policy under Delaware law.").

[98] *Halpern Med. Servs., LLC v. Geary*, 2012 WL 691623, at *3 (Del. Ch. Feb. 17, 2012).

Plaintiffs' arguments in favor of concluding that Defendants waived their ability to enforce the arbitration provision can be grouped into two categories: (1) the language of the Joint Letter expressly waives the arbitration provision or, in the alternative, (2) Defendants' actions in this litigation indicate an implicit waiver.[99] I take each category in turn, below.

### 1. Explicit Waiver: The Joint Letter

An explicit waiver occurs "where it is clear from the language used that the party is intentionally renouncing a right that it is aware of."[100] Where the parties have agreed, in writing, to waive an arbitration provision, "the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[101] If the agreement is clear and unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[102]

The Joint Letter, which Plaintiffs allege constitutes an explicit waiver of the arbitration provision with respect to Counts IV and V, states, in relevant part:

> By way of background, the [Partnership Agreement] . . . at issue in this action contains a mandatory arbitration provision (Section 9.05). While the parties disagree as to the provision's application to [P]laintiffs' claims in this action, [the parties] wish to inform the Court that they

---

[99] Pls.' AB 16–19.
[100] *Dirienzo*, 2009 WL 4652944, at *4.
[101] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).
[102] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997).

have mutually agreed to waive the arbitration provision to permit the complete resolution of their disputes before this Court.[103]

Plaintiffs contend that Defendants' agreement to waive the arbitration provision "to permit the *complete resolution of their disputes* before this Court" constitutes unambiguous agreement by Defendants to fully waive the arbitration provision in the course of this litigation.[104]  According to Plaintiffs, because the term "disputes" is not limited in scope to specific claims, pleadings, or disputes, Defendants cannot enforce the arbitration agreement with respect to Counts IV and V, even though those claims were not brought by Plaintiffs until two years after the Joint Letter was filed.[105]

In further support of their argument, Plaintiffs note that, in a letter filed separately by Defendants on May 20, 2021, Defendants paraphrased the language of the Joint Letter, stating "the parties have mutually agreed to *waive the arbitration provision* [in the Partnership Agreement] to permit the *complete resolution of their disputes before this Court*."[106]  Plaintiffs ask that the Court view this language with the knowledge that Defendants are sophisticated parties with sophisticated counsel who "clearly understand that the word 'dispute' is broader than specific causes of

---

[103] Joint Letter.
[104] *See* Pls.' AB 16 (quoting the Joint Letter) (emphasis added).
[105] Pls.' AB 16.
[106] *Id.* at 17 (quoting Letter to Vice Chancellor Glasscock from Steven L. Caponi re Pls.' Mot. to Expedite and Schedule, Dkt. No. 16) (emphases added) ("Defs.' Letter").

action, and that any given legal 'dispute' includes multiples claims that are not static but can be amended and supplemented."[107]

Defendants submit that the one sentence in the Joint Letter relied upon by Plaintiffs as evidence of waiver does not constitute an "intentional relinquishment of a right with both knowledge of its existence and intention to relinquish it."[108] Rather, Defendants advocate for a narrow reading of the language of the Joint Letter and that such reading demonstrates that Defendants' waiver of the arbitration provision was limited to the known claims asserted *at the time* the Joint Letter was filed.[109] I agree.

The Joint Letter states, "While the parties disagree as to the provision's application to [P]laintiffs' claims in this action, [the parties] wish to inform the Court that they have mutually agreed to waive the arbitration provision to permit the complete resolution of their disputes before this Court."[110] This statement is written in the present tense and, therefore, must be read as of the date the Joint Letter was submitted to the Court. As I read the Joint Letter, it is unambiguous that, as of May 20, 2021, Defendants were only aware of the counts asserted in Plaintiffs' original complaint, filed on April 12, 2021, and Defendants' counterclaims, filed on May 14,

---

[107] *Id.*
[108] *James Julian, Inc.*, 464 A.2d at 668 (quoting 6 C.J.S. *Arb.* § 37 (1975)).
[109] Defs.' OB 12–13.
[110] Joint Letter.

17

2021. The claims asserted prior to the Joint Letter related to (1) whether there had been a Disabling Event that enabled Plaintiffs to remove RHF1 and Coal Hill as General Partner and manager of the Fund, respectively, and (2) if there was no such Disabling Event, whether RHF1 could remove Plaintiffs as Limited Partners under the terms of the Partnership Agreement.[111] These claims did not include breach of contract nor breach of fiduciary duty, i.e., Counts IV or V. These torts are based, I note, in part on Defendants' action *not yet taken* at the time of the waiver.

Thus, a reading of the plain text of the Joint Letter illustrates that Defendants knowingly and intentionally waived their right to enforce the arbitration provision solely to those claims that were asserted as of the Joint Letter's submission, that is, Counts I–III of the original complaint and Defendants' counterclaims. As Defendants were not aware that Plaintiffs would assert Counts IV and V until nearly two years later, Defendants could not have known that their agreement in the Joint Letter to waive the arbitration provision would expose them to litigation over these not-yet-asserted claims. Therefore, the language of the Joint Letter demonstrates that Defendants' explicit waiver of the arbitration provision does not extend to Counts IV and V.

---

[111] *See* Verified Compl., Dkt. 1.

## 2. Implicit Waiver: Defendants' Conduct in This Litigation

Even if "no express language is used, an implied waiver of a right is possible, but only if there is 'a clear, unequivocal, and decisive act of the party demonstrating relinquishment of the right.'"[112]  A party taking actions "inconsistent with his right to arbitration, such as active participation in a lawsuit, shows an intent to relinquish his right to arbitration."[113]  While a parties' actions may implicitly waive their right to enforce an arbitration waiver, such waiver is not lightly inferred.[114]  When considering whether a party implicitly waived its right to arbitration, the Court considers "not merely the inconsistency of a party's actions, but the presence or absence of prejudice which is determinative of the issue of waiver."[115]  Typically, implicit waiver is found only where "the demand for arbitration or dismissal due to the arbitrability of the claims came along after the suit commenced and when both parties had engaged in extensive discovery."[116]

---

[112] *Dirienzo*, 2009 WL 4652944, at *5 (quoting 28 Am. Jur. 2d Estoppel and Waiver § 209 (2009)).

[113] *Zaret*, 1995 WL 56708, at *1.

[114] *See, e.g., Zenon v. Dover Downs, Inc.*, 2022 WL 2304118, at *2 (D. Del. June 27, 2022) (finding a party had not waived their right to enforce an arbitration provision even where that party filed an answer that did not assert arbitration as a defense, but sought to compel arbitration within six months of the complaints filing); *Morgan v. Sundance, Inc.*, 596 U.S. 411, 414–15, 419 (2022) (reversing a lower court's ruling that a party waived it right to arbitrate under the Federal Arbitration Act where the party (1) filed an answer containing no mention of the arbitration provision; (2) participated in a mediation; and (3) waited eight months before seeking to compel arbitration).

[115] *Halpern Med. Servs., LLC*, 2012 WL 691623, at *3 (citation omitted).

[116] *Id.*

Plaintiffs contend that Defendants' actions during the course of this litigation establish Defendants' intent to relinquish their right to arbitration.[117] In making this argument, Plaintiffs rely on two actions taken by Defendants that Plaintiffs allege are contrary to Defendants' claim that the waiver in the Joint Letter was limited to the Counts I–III.[118] First, Plaintiffs contend that Defendants would not have filed counterclaims in this action if Defendants' waiver of the arbitration provision was limited to the claims asserted by Plaintiffs in the original complaint.[119] Second, Plaintiffs point to Defendants' language in a separate letter filed on May 20, 2021, as evidence that Defendants understood the waiver to extend to resolving all disputes before the Court, including later-asserted claims because complaints can be amended and supplemented.[120] These actions, without more, are insufficient to demonstrate that Defendants acted inconsistent with their right to enforce the arbitration provision with respect to Counts IV and V.

Since Defendants filed their counterclaims on May 14, 2021, these counterclaims were known to both parties at the time the Joint Letter was submitted to the Court.[121] Under the plain terms of the Joint Letter's waiver, these counterclaims are within the scope of the "disputes before this Court[]" at the time

---

[117] Pls.' AB 17.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *See* Answer to Verified Compl. and Verified Countercls., Dkt. No. 8.

of the Joint Letter's submission.[122] Defendants' decision to file the counterclaims in response to Plaintiffs' claims in the original complaint is not an indication that Defendants intentionally relinquished their right to enforce the arbitration agreement for Counts IV and V, which were not yet known to Defendants.

Defendants' counterclaims themselves relate directly to the same subject matter as Counts I–III—whether there had been a Disabling Event and whether, as a result of "engineering the so-called 'disabling event[,]'" Defendants could terminate Plaintiffs' limited partnership interests.[123] The filing of these counterclaims is not inconsistent with Defendants' right to arbitrate Counts IV and V because Defendants agreed to waive the arbitration provision to resolve the disputes then before the Court, namely Counts I–III and Defendants' counterclaims.

As for Defendants' decision to file a separate letter filed on May 20, 2021, that reiterated to the Court that "the parties have mutually agreed to waive the arbitration provision [in the Partnership Agreement] to permit the complete resolution of their disputes before this Court[,]"[124] this letter does not purport to expand the Joint Letter's waiver. Indeed, it mirrors the pertinent language in the Joint Letter by reiterating that the waiver of the arbitration provision was limited to

---

[122] Joint Letter.
[123] Defs.' RB 3.
[124] Defs.' Letter.

the "disputes before this Court."[125] Defendants' letter goes on to explain that the central issue was whether or not a Disabling Event occurred.[126] There is no indication from the language of Defendants' letter or the filing of the letter itself that indicates that Defendants were issuing a blanket waiver of their right to arbitrate any claims that could be later be brought against them by Plaintiffs. Defendants issued the May 20, 2021 letter many months before Plaintiffs sought to add the tort claims.

Since Plaintiffs sought to amend their complaint to assert two new claims, Defendants have sought to enforce their right to arbitrate. Defendants asserted their right to arbitrate in both their opposition to Plaintiffs' request for leave to amend their complaint[127] and in their arguments in support of their motion to dismiss the newly added claims.[128] Defendants' actions with respect to Counts IV and V have been consistent with their right to arbitrate. Plaintiffs have not alleged any prejudice they will face if Defendants are allowed to assert their right to arbitrate these new claims.[129] Thus, the evidence before the Court is insufficient to find that Defendants implicitly waived their right to arbitrate Counts IV and V.

---

[125] *See id.*

[126] *See id.*

[127] *See* Defs.' Opp'n to Pls.' Mot. for Leave to File First Am. Verified Compl. ¶¶ 4–14, 30–41, Dkt. No. 50.

[128] *See* Defs.' OB 9–14; Defs.' RB 1–7.

[129] *See* Pls.' AB 15–19.

## III. CONCLUSION

The parties' agreement to waive the mandatory arbitration provision contained in the Partnership Agreement was limited to the claims before the Court at the time of Joint Letter's filing on May 20, 2021. Defendants' waiver of their right to arbitrate those claims in 2021 does not extend to claims Plaintiffs chose to bring nearly two years later. Since the filing of the Amended Complaint, Defendants' actions have been consistent with their right to arbitrate. Therefore, Defendants' motion to dismiss is GRANTED. The parties should submit an appropriate form of order in accordance with this opinion and inform me of their intention regarding the claims not addressed here.